IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,            )
                                     )
                    Plaintiff,       )
                                     )
        v.                           )        No. 3:13-CR-10
                                     )
CLIFFORD LEON HOUSTON,               )        (REEVES / SHIRLEY)
                                     )
                    Defendant.       )

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C.

§ 636(b) for disposition or report and recommendation regarding disposition by the District Court

as may be appropriate. This case is before the Court the Defendant's six motions to suppress

evidence obtained from the warrantless surveillance of his property with a pole camera, the January

11, 2013 search of his residence, and the seizure of his person on January 11, 2013:

>    (1) Motion to Suppress No. 1 [Doc. 14], filed on February 15, 2013;

>    (2) Motion to Suppress No. 2 [Doc. 16], filed on February 15, 2013;

>    (3) Motion to Suppress No. 3 Doc. 18], filed on February 15, 2013;

>    (4) Motion to Suppress No. 4 [Doc. 20], filed on February 15, 2013;

>    (5) Motion to Suppress All Prosecutorial Evidence[] [Doc. 47], filed
>    on March 22, 2013;

>    (6) Motion to Dismiss Search and Seizure Warrant No. 3:13MJ1005
>    [Doc. 57], filed on March 22, 2013, and

>    (7) Motion to Dismiss Search and Seizure Warrant MJ-2165 [Doc.
>    58], filed on March 22, 2013.

1

On April 16, 2013, the Court held a motion hearing on all pending pretrial motions. Assistant United States Attorney David C. Jennings represented the Government. The Defendant represented himself[1] with the assistance of elbow counsel, Attorney Charles I. Poole. The transcript of the April 16 hearing [Doc. 97] was filed on May 13, 2013. Following the receipt of the transcript, the Court took the Defendant's motions under advisement.

## I. POSITIONS OF THE PARTIES

The Defendant is charged [Doc. 92] with one count of possession of a firearm while being an unlawful user of a controlled substance (Count One)[2] and one count of transmitting a threat in interstate commerce using a telephone (Count Two). The charge alleged in Count One arises out of an investigation of the Defendant's brother Rocky Joe Houston for possession of firearms while being a felon. In furtherance of this investigation, agents of the Bureau of Alcohol, Tobacco, and Firearms (ATF) installed a pole camera on a public utility pole adjacent to the Houston family

---

[1]The Defendant was initially represented by court-appointed counsel. On March 4, 2013, the Defendant asked to represent himself with the assistance of elbow counsel. The Court advised the Defendant of the risks and perils of representing himself using the litany provided in United States v. McDowell, 814 F.3d 245, 251 (6th Cir. 1987). Despite the Court's advice, the Defendant chose and the Court permitted [Doc. 37] the Defendant to represent himself. The Court appointed [Doc. 38] Attorney Charles I. Poole to serve as elbow counsel. At the April 16 hearing, the Court again offered to appoint counsel for the Defendant, but the Defendant stated that he wanted to continue to represent himself at this time.

[2]At the time the Defendant filed and argued his motions, he was charged [Doc. 6] only with possession of a firearm while being an unlawful user of a controlled substance. The Government brought a Superseding Indictment on May 7, 2013, in which the original charge is Count One and Count Two is added. At his May 13, 2013 arraignment on the Superseding Indictment, the Court reopened the motion-filing deadline to June 3, 2013, for any motions relating to Count Two. Accordingly, any challenges to Count Two of the Superseding Indictment will be addressed in a separate report and recommendation.

2

property on Barnard Narrows Road in Ten Mile, Tennessee, on October 9, 2012. The camera had

a view of the rear of the Defendant's mobile home residence at 391Barnard Narrows Road and the

surrounding fields and roads. On December 19, 2012, the ATF obtained a Search and Seizure

Warrant, authorizing the "search of the following person or property located in the Eastern District

of Tennessee" identified as "the real property on which lies residences located at 373 Barnard

Narrows Road, Ten Mile, Tennessee, 391 Barnard Narrows Road, Ten Mile, Tennessee, and 412

Barnard Narrows Road, Ten Mile, Tennessee, through the continued use of and recording by a video

camera installed on a public telephone pole." On January 11, 2013, ATF obtained search warrants

for Houston family property at 373 Barnard Narrows Road (Defendant's brother Rocky Houston's

primary residence), 391 Barnard Narrows Road (Defendant's residence); and 412 Barnard Narrows

Road (Rocky Houston's daughter's residence). These search warrants were executed on the evening

of January 11, 2013. On that evening, before the execution of the search warrants, the Defendant

was seized and detained by law enforcement officers present to secure the property in anticipation

of the awaited search warrants.

      The Defendant calls for the suppression of all evidence seized as a result of the video footage

from the pole camera and the seizure of his person. He argues that the video footage from October

9 through December 19, 2012, was illegally obtained without a search warrant in violation of the

Fourth Amendment. He also contends that the December 19, 2012 search warrant authorizing

continued use of the pole camera was invalid because it was not signed by a neutral and detached

judge and was not supported by probable cause. He contends that the January 11, 2013 search

warrant for his residence was invalid because it was not issued by a neutral and detached judge and

was not supported by probable cause. Finally, the Defendant asserts that he was illegally seized on

January 11, 2013, and any statements he made after his illegal seizure must be suppressed.

The Government responds that no warrant was necessary for the use of a pole camera to view the curtilage of the Houston family property because it is an area that officers could view from a legal vantage point. The Government argues that ATF agents acted in good faith in seeking and procuring a search warrant on December 19, 2012, for the continued use of the pole camera, after the Court of Appeals for the Sixth Circuit questioned, in dicta, the constitutionality of extended warrantless video surveillance of curtilage. The Government contends that both the December 19, 2012 search warrant authorizing the continued use of the pole camera and the January 11, 2013 search warrant for the Defendant's residence were issued by neutral and detached magistrates and based upon probable cause. Moreover, it asserts that probable cause would support the issuance of these search warrants even absent any evidence gained from the warrantless video surveillance with the pole camera. Finally, the Government asserts that on the evening of January 11, 2013, the Defendant was properly seized for officer safety and was advised of the <u>Miranda</u> warnings before he made any statements.


## II. SUMMARY OF THE EVIDENCE

Evidence concerning the pole camera and the events of the Defendant's seizure on January 11, 2013, was presented at both the Defendant's detention hearing on January 17, 2013, and the motion hearing on April 16, 2013.


### A. January 17, 2013 Detention Hearing

At the January 17, 2013 detention hearing, Roane County Sheriff's Investigator Jason Mynatt

testified that in the fall of 2012 his agency and the ATF began investigating the possible possession of firearms by Rocky Houston, a convicted felon. [Tr. at 22][3]  In October 2012, a covert video camera was installed on a public utility pole on Dogtown Road. [Tr. at 23] The camera could zoom and pan. [Tr. at 44-45] Investigator Mynatt monitored the camera over the course of several months. [Tr. at 44]

Investigator Mynatt stated that on January 11, 2013, ATF Agent Jason Dobbs and Roane County Sheriff's officers arrested Rocky Houston on a federal Criminal Complaint at the United Community Bank where Rocky Houston's wife works. [Tr. at 26-28] Following Rocky Houston's arrest, Investigator Mynatt went to the command post to monitor the pole camera "for safety reasons," while Agent Dobbs sought search warrants for the Houston residences. [Tr. at 29-30] Also during this time, a law enforcement team went to secure Rocky Houston's residence until a search warrant was issued. [Tr. at 30] While monitoring the camera, Investigator Mynatt saw someone at the rear of the Defendant's trailer residence. [Tr. at 30] Investigator Mynatt attempted to notify the officers at Rocky Houston's property but was not able to do so due to other radio conversations. [Tr. at 30] Investigator Mynatt then observed via the camera that officers on the scene had noticed the individual get on a four-wheeled utility vehicle (ATV). [Tr. at 30-31] Investigator Mynatt saw the individual, whom he stated was the Defendant, drive toward Rocky Houston's residence at a rapid pace. [Tr. at 31-32]  Law enforcement officers on the scene drew their guns and ordered the Defendant to stop, and he did so. [Tr. at 31-32] The officers took several firearms from the Defendant and detained him at Rocky Houston's residence. [Tr. at 31]  Investigator Mynatt later

---

[3]The transcript [Doc. 12] of the January 17, 2013 detention hearing was entered on January 30, 2013.

5

learned that the weapons, which were loaded, were an assault rifle, another rifle in a case strapped to the ATV, and a handgun.  [Tr. at 32-33]

Investigator Mynatt testified that he arrived at the Houston property about an hour after the Defendant was taken into custody, and he participated in the search of the Defendant's residence. [Tr. at 31, 42] He stated that in the Defendant's residence, law enforcement found firearms, marijuana residue in a frisbee in the kitchen, and hemostats used for smoking controlled substances. [Tr. at 43, 47]  They also found a lockbox containing a bag of marijuana in the shed beside the Defendant's trailer.  [Tr. at 43]

On cross-examination, Investigator Mynatt stated that the single video camera was not on the Defendant's property but was positioned across from the Defendant's aunt's house.  [Tr. at 60] He acknowledged that during the time he monitored the pole camera, the Defendant was not a convicted felon and could carry firearms.  [Tr. at 61] He stated that officers did not have an arrest warrant for the Defendant on January 11, 2013.  [Tr. at 62] Investigator Mynatt testified that law enforcement did not have a search warrant when they entered Rocky Houston's property to secure it on that evening.  [Tr. at 62] He agreed that at the time the Defendant was spotted on the ATV, the Defendant could possess firearms legally.  [Tr. at 63] Investigator Mynatt said that other officers told him that when they saw that the Defendant was armed, they told him to stop.  [Tr. at 63] The Defendant stopped as directed, was handcuffed, and was taken into custody.  [Tr. at 63-64] Investigator Mynatt did not recall whether the officers told him that the Defendant had been given the Miranda warnings. [Tr. at 70] The Defendant spoke to the officers at length and Investigator Mynatt was told that the Defendant admitted that he had been drinking and smoking marijuana that night.  [Tr. at 70-71] The Defendant was still talking with agents when Investigator Mynatt arrived at the Houston property.

6

[Tr. at 70] Investigator Mynatt testified that upon his arrival, the Defendant appeared to be under the influence of intoxicants to him. [Tr. at 70] The Defendant was still on Rocky Houston's property when the search warrants were executed. [Tr. at 64]

## B. April 16, 2013 Motion Hearing

At the April 16, 2013 motion hearing, the Government called ATF Agent Jason Dobbs. Agent Dobbs testified that he had been an ATF agent for nearly five years. [Tr. at 44][4] He stated that in October 2012, the ATF along with the Roane County Sheriff's Department began an investigation of the possession of firearms by convicted felon Rocky Houston. [Tr. at 44] Agent Dobbs stated that between January 2012 and October 2012, he received information, which he considered to constitute probable cause that Rocky Houston possessed firearms. [Tr. at 44] In early October 2012, ATF agents decided to install a pole camera to continue the investigation of Rocky Houston's possession of firearms. [Tr. at 45] On October 9, 2012, the camera was installed on a telephone pole located in the public-right-of-way on Dogtown Road across from the Johnson residence. [Tr. at 45, 55] The agents did not have a search warrant for the installation of the camera, nor was Agent Dobbs aware of any legal authority requiring a search warrant for the use of a pole camera. [Tr. at 60-61] The camera was placed above the roof line of the Johnson residence and overlooked the open fields on the Houston property, the rear of the Defendant's trailer, and rear and side of Rocky Houston's residence. [Tr. at 48] The camera could pan left and right and had a zoom function. [Tr. at 48, 57]

Agent Dobbs stated that an individual traveling on Dogtown Road toward the intersection

_____

[4]As stated above, the transcript [Doc. 97] of the April 16 hearing was filed on May 13, 2013.

with Barnard Narrows Road would have a "clear view" from the road of the back of the Defendant's residence, the open fields, and a portion of Rocky Houston's residence. [Tr. at 49-50] An individual traveling on Barnard Narrows Road would have a "clear view" of the front of the Defendant's property including the front porch of his mobile home. [Tr. at 50] He stated that there are a series of hand-painted signs near the road in the front yard of the Defendant's trailer. [Tr. at 51-52] Agent Dobbs stated that these signs alleged corruption and crimes and named judges and public officials. [Tr. at 53] One sign contained photographs of the deceased bodies of a law enforcement officer and his ride-along companion. Another sign stated "military intervention required" in apparent reference to the allegations on the other signs. [Tr. at 54] Agent Dobbs deemed these signs, which had been posted for years, to contain a message that the Houston brothers wanted to convey to the public. [Tr. at 55]

Agent Dobbs testified that law enforcement officers monitored the camera remotely online through a secure server during daylight hours, and the camera also recorded. [Tr. at 55] Officers monitored the camera a few times at night to observe whether there was any activity in preparation for serving search warrants for the residences. [Tr. at 56] The officers monitoring the camera were trained to look primarily for Rocky Houston possessing firearms. [Tr. at 58] Agent Dobbs stated that the officers did not use the camera to view the inside of the residences through windows, nor was it possible to do so. [Tr. at 57] Although the camera had the ability to zoom closer, the officers kept it focused at roughly the view that could be seen with the naked eye from the road because the image became blurry if they zoomed in beyond that. [Tr. at 57]

Agent Dobbs stated that as a result of monitoring the camera, law enforcement learned that the Defendant and his brother Rocky Houston spent virtually all of every day together. [Tr. at 58]

8

Accordingly, Agent Dobbs opined that in monitoring Rocky Houston for the possession of firearms, the officers necessarily often saw the Defendant on the camera. [Tr. at 58] The brothers spent the majority of their time in and around the Defendant's residence. [Tr. at 58] Through the camera, officers observed Rocky Houston possessing firearms around the Defendant's residence, in the open field surrounding the Defendant's residence, and in the front yard of the Defendant's residence near the road, where the Defendant and Rocky Houston were observed target shooting on several occasions. [Tr. at 59] Beside an open barn or shed located beside the Defendant's driveway in his front yard, the brothers had a "shooting rest table," where they kept ear muffs and a sand bag on which a rifle could be rested. [Tr. at 60] Agent Dobbs stated that anyone driving on Barnard Narrows Road could have seen the Houston brothers target shooting at this location. [Tr. at 60]

Agent Dobbs testified that on December 19, 2013, he received a telephone call from Assistant United States Attorney David Jennings regarding a case, United States v. Anderson-Bagshaw, that the Court of Appeals for the Sixth Circuit had just published. [Tr. at 61] AUSA Jennings told Agent Dobbs that the opinion contained some language questioning the constitutionality of the extended or continuing use of a pole camera without a search warrant. [Tr. at 62] AUSA Jennings asked Agent Dobbs to come to his office immediately to prepare an affidavit in support of an application for a search warrant for the continued use of the pole camera. [Tr. at 62] On that day, United States Magistrate Judge H. Bruce Guyton issued a search warrant authorizing the continued use of the pole camera. [Tr. at 62] Agent Dobbs stated that following the issuance of the search warrant, the pole camera was monitored as before. [Tr. at 62]

Agent Dobbs stated that on November 1, 2013, Judge Guyton issued an arrest warrant for Rocky Houston based upon the observation from the pole camera of Rocky Houston in possession

of firearms between October 9 and November 1. [Tr. at 63] In early January 2013, Agent Dobbs participated in planning for the safe arrest of Rocky Houston and for the execution of search warrants on the Houston family property. [Tr. at 63] On January 11, 2013, officers observed Rocky Houston drive into town and park at the bank where his wife worked. [Tr. at 64] Around 6:00 p.m., Agent Dobbs and some Roane County Sheriff's deputies arrested Rocky Houston in the bank parking lot. [Tr. at 65] Afterward, Agent Dobbs returned to Knoxville and sought search warrants for the Defendant's and Rocky Houston's residences. [Tr. at 65] Around 8:30 p.m., Agent Dobbs and AUSA Jennings presented a search warrant affidavit and search warrant applications to United States Magistrate Judge C. Clifford Shirley, Jr. [Tr. at 66] During that time, Agent Dobbs and AUSA Jennings heard from agents on the scene at Rocky Houston's residence awaiting the issuance of the search warrants that they wanted to conduct a protective sweep of Rocky Houston's residence for their safely. [Tr. at 66]

Agent Dobbs testified that he later learned from officers on the scene that during the protective sweep of Rocky Houston's house, some officers saw the Defendant get onto a four-wheeled All Terrain Vehicle (ATV) at his mobile home. [Tr. at 67] Agents heard the ATV start and saw the Defendant drive from his trailer toward Rocky Houston's house. [Tr. at 68] It was dark out, and "for safety sake," the agents confronted the Defendant in the field between the Defendant's and Rocky Houston's homes. [Tr. at 68] The agents ordered the Defendant to stop. [Tr. at 69] The Defendant, who was armed with three firearms on his person and the ATV, stopped. [Tr. at 69] The agents detained the Defendant and advised him of his Miranda rights. [Tr. at 69] Agent Dobbs testified that after receiving the advice of rights, the Defendant agreed to talk with the agents. [Tr. at 71] Agents brought the Defendant to Rocky Houston's open carport. [Tr. at 69] Agent Dobbs and

10

AUSA Jennings were still meeting with Judge Shirley when they learned that the Defendant had been detained. [Tr. at 69] Thereafter, Judge Shirley issued search warrants for the Defendant's residence, Rocky Houston's residence, and another residence on the Houston family property. [Tr. at 69-70] Agent Dobbs then traveled to the scene to assist in the execution of the search warrants. [Tr. at 70] Upon Agent Dobbs' arrival at Rocky Houston's residence, the Defendant was still seated in the carport and was talking with an ATF agent. [Tr. at 70]

On cross-examination, Agent Dobbs testified that his supervisor ATF Resident Agent in Charge Steve Cordle initiated the investigation of Rocky Houston's possession of firearms as a convicted felon. [Tr. at 73-74] Agent Dobbs testified that although Rocky Houston's felony conviction was common knowledge, he also received information on Rocky Houston's criminal history from the Roane County Sheriff's Department and court documents. [Tr. at 86] Agent Dobbs agreed that he had taken an oath of office that included swearing to uphold the United States Constitution. [Tr. at 74] Agent Dobbs stated that he did not believe the pole camera was unconstitutional at the time it was installed. [Tr. at 92] He related that on the day that the Anderson-Bagshaw opinion was issued, he decided to obtain a search warrant for the continued use of the pole camera "out of an abundance of caution," although he did not believe that the opinion made a search warrant mandatory. [Tr. at 93]

Agent Dobbs stated that only one camera was used to observe the Houston property and that it was installed by Volunteer Electric across Dogtown road from the Houston property. [Tr. at 75] He stated that although the investigation centered on Rocky Houston, the pole camera included a view of the Defendant's yard because law enforcement had information that Rocky Houston possessed firearms around the Defendant's residence. [Tr. at 89] Agent Dobbs acknowledged that

11

one could not see the Houston property from the ground directly beneath the pole camera because the Johnson residence blocked the view but explained that the Defendant's property was visible from either side of the Johnson residence. [Tr. at 76] Agent Dobbs stated that the pole camera was not certified by the state of Tennessee and that no such certification existed. [Tr. at 77] Agent Dobbs stated that Ray and Juanita Johnson, who lived in the residence directly across Dogtown Road from the pole camera, were observed on the camera when they made almost daily trips to the Defendant's residence. [Tr. at 79] Also, the camera occasionally captured the front of the Johnson residence, which was visible to the public from Dogtown Road. [Tr. at 79] Agent Dobbs acknowledged that it was possible that the camera was used to zoom in on paperwork held by the Johnsons at one point. [Tr. at 79] The zoom and pan functions on the camera were controlled by a cellular telephone "air card type of operating system." [Tr. at 79]

Agent Dobbs testified that law enforcement conducted multiple "drive-by's" of the Houston property and saw the Defendant and Rocky Houston with firearms on some of those drive-by's. [Tr. at 102] He stated that law enforcement did not observe the Defendant engaging in any illegal activity during the drive-by's. [Tr. at 103] Agent Dobbs denied altering any of the video footage from the pole camera. [Tr. at 103] He was unaware of any video footage of the Defendant relieving himself. [Tr. at 103]

Agent Dobbs testified that at the time the Defendant was seized on January 11, 2013, the agents did not have a search warrant or a warrant for the Defendant's arrest. [Tr. at 95] He did not recall whether the Defendant signed a written waiver of his Miranda rights. [Tr. at 94] He said other agents told him that the Defendant was read his Miranda rights immediately after he was taken into custody. [Tr. at 95] The agents then took the Defendant to Rocky Houston's carport. [Tr. at 95]

12

While the Defendant was talking with officers in the carport, an agent began recording the conversation.  [Tr. at 95]

Agent Dobbs stated that the search warrants for the Defendant's and Rocky Houston's residences were signed around 8:30 p.m.  [Tr. at 98] Based upon this time frame, Agent Dobbs estimated that officers initially arrived at Rocky Houston's property around 8:00 p.m.  [Tr. at 98] As soon as the search warrants were signed, Agent Dobbs called his supervisor and informed him that the judge had issued the search warrants.  [Tr. at 99] Agent Dobbs then traveled to the Houston property with the search warrants, which took approximately forty-five minutes.  [Tr. at 99] The Defendant had already been taken into custody before Agent Dobbs arrived at the Houston property.  [Tr. at 99] The agent who was speaking with the Defendant in the carport later told Agent Dobbs that the Defendant said "he had been getting high and getting drunk."  [Tr. at 112] Agent Dobbs did not personally hear the Defendant make that comment or make any reference to "wacky tobacco."  [Tr. at 117, 125] Agent Dobbs also did not know if this comment by the Defendant was on the recording.  [Tr. at 118] Agent Dobbs testified that during the execution of the search warrant for the Defendant's residence, he smelled the odor of marijuana in the Defendant's home.  [Tr. at 122] He also found marijuana residue in the Defendant's home, and the residue was sent to a laboratory.  [Tr. at 123]

### III.  FINDINGS OF FACT

Based upon the evidence presented at the detention hearing and the motion hearing, the Court makes the following findings of fact:  In 2012, the ATF and the Roane County Sheriff's Department began an investigation into the alleged possession of firearms by the Defendant's brother Rocky Houston, whom they knew to be a convicted felon.  On October 9, 2012, the ATF engaged Volunteer

13

Electric utility company to install a video camera on a public utility pole on Dogtown Road in Ten Mile, Tennessee. The pole camera, which was located directly across Dogtown Road from the residence of Ray and Juanita Johnson, had a view of the rear of the Defendant's mobile home residence, his back yard, the pasture and fields surrounding his residence, and the rear of Rocky Houston's residence. In addition to recording, the camera was monitored by law enforcement agents remotely through an internet connection primarily during the daytime. The camera was monitored on a few occasions at night. The monitoring officers could cause the camera to pan and to zoom, although the focus was mostly maintained at what could be seen with the naked eye from Dogtown Road because additional magnification made the image blurry. The camera could not see into the Defendant's residence.

The pole camera was installed and monitored without a search warrant or other judicial authorization from October 9 to December 19, 2012. During this time, law enforcement observed the Defendant and Rocky Houston, via the camera, carrying and shooting firearms on the Defendant's property on numerous occasions. On December 19, 2012, ATF Agent Jason Dobbs sought a search warrant authorizing the continued use of the pole camera and provided an affidavit in support thereof. United States Magistrate Judge H. Bruce Guyton issued a search warrant authorizing the continued use of the pole camera on that same day. Following the issuance of this search warrant, law enforcement monitored the pole camera in the same manner as before the search warrant.

On January 11, 2013, ATF agents and Roane County deputies arrested Rocky Houston at the bank where his wife worked. Following this arrest, Agent Dobbs went to Knoxville, Tennessee, to obtain federal search warrants to search the three residences on the Houston family property. Law

14

enforcement arrived at Rocky Houston's residence around 8:00 p.m. on January 11, 2013, in anticipation of executing a search warrant at the residence. Officers entered Rocky Houston's property and began to secure it. While engaged in this task, officers saw the Defendant get on a ATV by his residence and ride toward Rocky Houston's property at a rapid pace. The officers could see that the Defendant was armed and drew their weapons. They met the Defendant in the field between the Defendant's and Rocky Houston's residences and ordered him to stop. The Defendant complied with this order. The officers detained the Defendant and handcuffed him. An agent advised the Defendant of the <u>Miranda</u> warnings, the Defendant agreed to talk with officers, and the officers removed the Defendant to Rocky Houston's carport. Before the search warrants were signed at around 8:30 p.m., agents on the scene called Agent Dobbs to advise him that the Defendant had been taken into custody. Sometime following his receipt of the <u>Miranda</u> warnings, the Defendant spoke with an ATF agent and made the statement that he had been "getting high and getting drunk" that evening.

When Agent Dobbs arrived at Rocky Houston's residence around 9:15 p.m. on January 11, 2013, the Defendant was still speaking with an ATF agent in Rocky Houston's carport. Investigator Mynatt arrived at the Houston property around that same time, which was approximately an hour after he saw, via the pole camera, the officers stop the Defendant. When Officer Mynatt arrived, the Defendant was still speaking with an agent and appeared to be intoxicated. Agent Dobbs, Investigator Mynatt, and other officers searched the Defendant's residence pursuant to a search warrant and seized marijuana residue, drug paraphernalia, and firearms.

15

# IV. ANALYSIS

The Fourth Amendment requires that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." U.S. Const. amend. IV. "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment–subject only to a few specifically established and well-delineated exceptions." Katz v. U.S., 389 U.S. 347, 357 (1967) (footnotes omitted). "The touchstone of Fourth Amendment analysis is whether a person has a 'constitutionally protected reasonable expectation of privacy." California v. Ciraolo, 476 U.S. 207, 211 (1986).

The Defendant seeks to suppress all evidence resulting from (1) the warrantless use of a pole camera to observe his property from October 9, 2012, to December 19, 2012; (2) the continued use of the pole camera to monitor his property pursuant to a December 19, 2012 search warrant;(3) the search of his residence on January 11, 2013, and (4) the seizure of his person on that same date. He argues that the warrantless use of the pole camera violated his rights under the Fourth Amendment and that the subsequent search warrants which were issued based upon earlier "warrantless" video footage from the pole camera are invalid. He also challenges the neutrality of the issuing judge for each of the search warrants. Finally, the Defendant argues that he was illegally seized on January 11, 2013, and that any statements resulting from the illegal seizure must be suppressed. The Court examines each of these issues in turn.

16

## A.  Use of Pole Camera from October 9, 2012, to December 19, 2012

The Defendant argues that ATF agents conducted a warrantless search of Houston family property by installing a pole camera on an adjacent utility pole and monitoring the video footage from this camera from October 9, 2012, through December 19, 2012.  He argues that he has a legitimate privacy interest in being free from warrantless video surveillance.  He also contends that the length of the video surveillance (10 weeks) was unreasonable.  Thus, he contends that the extended warrantless video surveillance of his property violated the Fourth Amendment and that all evidence stemming from the video footage must be suppressed.

The Government responds that the use of a pole camera to conduct video surveillance of the Defendant's curtilage is not a search within the meaning of the Fourth Amendment because agents could lawfully view the Defendant's property from the public location where the camera was installed.  The Government argues that at the time the pole camera was installed, officers could view the Houston family property from two public roads.  It contends that the Defendant's property was not fenced and that, in fact, the Defendant and his brother invited the public to view their property by erecting billboards on their property twenty yards from the road.  Finally, the Government contends that law enforcement had a good faith belief that they did not need a search warrant to conduct video surveillance of the property and, thus, the exclusionary rule should not be applied in this case.

*(1) Is Video Surveillance a Search that Implicates the Fourth Amendment?*

Generally, the curtilage of a home, which is "the land immediately surrounding and associated with the home," is afforded the same protection that the Fourth Amendment extends to

17

the home. <u>Oliver v. United States</u>, 466 U.S. 170, 179 (1984). "At common law, the curtilage is the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life,' . . . , and therefore has been considered part of home itself for Fourth Amendment purposes." <u>Id.</u> (quoting <u>Boyd v. United States</u>, 116 U.S. 616, 630 (1886)).[5] Nevertheless, "[t]he Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares." <u>Ciraolo</u>, 476 U.S. at 213. Thus, the Supreme Court has held that the aerial observation of a fenced backyard was not subject to the warrant requirement of the Fourth Amendment. <u>Id.</u> at 214. In so holding, the Court observed that an individual growing marijuana in his backyard cannot assume that his conduct will not be viewed "by a passing aircraft–or by a power company repair mechanic on a pole overlooking the yard." <u>Id.</u> at 215. Yet, the Court warned that either physical intrusion or advances in technology that disclosed otherwise unseen activities to law enforcement could render aerial observation "'invasive.'" <u>Id.</u>

At the time that the pole camera in the instant case was installed on October 9, 2012, only a few courts had examined the issue of whether video surveillance of curtilage is a search that implicates the Fourth Amendment. The Tenth Circuit has held that the "use of video equipment and cameras to record activity visible to the naked eye does not ordinarily violate the Fourth Amendment." <u>United States v. Jackson</u>, 213 F.3d 1269, 1280 (10th Cir.), <u>jmt vacated on other gnds</u>, 531 U.S. 1033 (2000). In <u>Jackson</u>, the Court analyzed the warrantless use of two video cameras

_____

[5]In contrast, open fields, even if fenced and posted with signs proscribing trespass, are not protected by the Fourth Amendment: "[A]n individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home." <u>Oliver</u>, 466 U.S. at 178 (affirming the open fields doctrine).

18

installed on telephone poles, which law enforcement used to observe two residences. The cameras had a zoom function and could be remotely adjusted but could not be used to see into the houses and did not record sound. Id. at 1276. Observing that the protection under the Fourth Amendment does not extend to activity that one knowingly exposes to the public, the court reasoned that the cameras at issue could not be used to see inside the houses and could only see what any passerby could see. Id. at 1281. Accordingly, the court determined that the defendants had no reasonable expectation of privacy in what the cameras recorded. Id. The undersigned notes that the length of the video surveillance, which extended over several months, see id. at 1277-78, was not at issue in Jackson.

Likewise, the Eastern District of Wisconsin also ruled that video surveillance of a driveway in front of a house did not implicate the Fourth Amendment because the camera, installed on a utility pole, did not permit law enforcement to see anything not otherwise visible through "traditional, street-level surveillance techniques." United States v. Urbina, No. 06-CR-336, 2007 WL 4895782, *7 (E.D. Wis. Nov. 6, 2007), adopted by United States v. Aguilera, No. 06-CR-336, 2008 WL 375210 (E.D. Wis. Feb. 11, 2008). Although the court expressed concern over the potential for abuse of video surveillance, it found that the video surveillance at issue captured no footage not "otherwise exposed to public view":

> If the investigative agents had chosen to utilize traditional surveillance methods and parked across the street and simply monitored the persons coming and going from the defendant's residence, it is unlikely that such actions would have inspired a motion to suppress; such actions are clearly constitutional. However, such traditional surveillance methods are distinct from the omnipresence of a covert surveillance camera. "[I]t [is] unarguable that television surveillance is exceedingly intrusive . . . and inherently indiscriminate, and that it could be grossly abused to eliminate personal privacy as understood in modern Western nations." United States v. Torres, 751 F.2d 875, 882 (7th Cir.1984). "This type of

19

surveillance provokes an immediate negative visceral reaction: indiscriminate video surveillance raises the spectre of the Orwellian state." United States v. Nerber, 222 F.3d 597, 602 (9th Cir. 2000) (quoting [United States v. ]Cuevas-Sanchez, 821 F.2d [248, 251 [5th Cir. 1987)]).

There are many legitimate reasons for this court and the general public to be concerned about indiscriminate law enforcement video surveillance, particularly if it is aimed at private homes. Turning to the specific facts of this case, those valid privacy concerns are not implicated. The court finds that the fact that law enforcement chose to install a surveillance camera, as opposed to utilizing more traditional surveillance techniques, does not change the result from a Fourth Amendment perspective.

Id. at *6-7; see also United States v. Nowka, No. 5:11–CR–474–VEH–HGD, 2012 WL 6610879, *5 (N.D. Ala. Dec. 17, 2012) (holding eight-month warrantless surveillance of defendant's yard and driveway from pole camera mounted on utility pole was not a search under Fourth Amendment because defendant has no reasonable expectation of privacy in view, "which any person could see from the public street"); United States v. Brooks, No. 11-2265-PHX-JAT-003, 2012 WL 5984804, *7 (D. Ariz. Nov. 28, 2012) (holding five-month warrantless video surveillance of apartment complex parking lot and stairwells with pole camera did not violate Fourth Amendment because defendant had no reasonable expectation of privacy in area open to public view).

In contrast, the Fifth Circuit has recognized that when an individual manifests a subjective expectation of privacy in curtilage, such as by enclosing the area with a ten-foot tall fence that blocks the view from the street, then video surveillance constitutes a search under the Fourth Amendment. United States v. Cuevas-Sanchez, 821 F.2d 248, 251 (5th Cir. 1987). In Cuevas-Sanchez, law enforcement suspected that the defendant's home was a stash house for illegal narcotics. Id. at 249. Agents sought and received a court order authorizing thirty days of video surveillance and directing

20

the agents to minimize observation of innocent conduct and to stop surveillance when none of the suspects were at the residence. Id. at 249-50. Agents installed a video camera on a utility pole overlooking the fence surrounding the defendant's backyard. Id. at 250. The court rejected the government's argument that the video surveillance of curtilage is not a search, holding that the defendant had fenced his backyard to screen it from public view, that the defendant's backyard was within his curtilage, and that the defendant's expectation that he would be free of continuous video surveillance from above his fence was reasonable. Id. at 251. In so holding, the court distinguished the facts before it from the situation of the one-time, flyover in Ciraolo: "It does not follow that Ciraolo authorizes any type of surveillance whatever just because one type of minimally-intrusive aerial observation is possible." Id. Concluding that the video surveillance was a search under the Fourth Amendment, the court approved the issuance of an order under the statutory standards relating to wiretaps. Id. at 251-52 (determining that the standards set forth in 18 U.S.C. §§ 2510-20 "protect the constitutional rights of those under surveillance").

In January 2012, the Supreme Court examined whether affixing a Global Positioning System (GPS) tracking device to a vehicle and monitoring the vehicle's movements on public roadways constituted a search under the Fourth Amendment. United States v. Jones, 132 S. Ct. 945 (2012). Justice Scalia, writing for the majority, determined that the development in Katz of the "reasonable expectation of privacy" standard did not repudiate earlier Fourth Amendment jurisprudence preventing the government's warrantless trespass upon individuals, homes, papers, and effects. Id. at 950-51. Because the defendant's vehicle was an "effect," the placement of a GPS tracking device on its undercarriage for the purpose of gathering information was a search under the Fourth Amendment. Id. at 951. In so holding, the lead opinion states that "[t]his Court has to date not

deviated from the understanding that mere visual observation does not constitute a search." Id. at 953. Additionally, whether a particular government action constitutes a search has traditionally not turned upon whether the action occurred over a certain time period or related to the investigation of a certain type of crime. Id. at 954.

However, in her concurring opinion, Justice Sotomayor observed that GPS monitoring can occur without a physical trespass and agreed with the four justices who concurred in the judgment only "that, at the very least, 'longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy.'" Id. at 955 (Sotomayor, J., concurring). "[B]ecause GPS monitoring is cheap in comparison to conventional surveillance techniques and, by design, proceeds surreptitiously, it evades the ordinary checks that constrain abusive law enforcement practices: 'limited police resources and community hostility.'" Id. at 956 (Sotomayor, J., concurring) (quoting Illinois v. Lidster, 540 U.S. 419, 426 (2004)). Moreover, "[a]wareness that the Government may be watching chills associational and expressive freedoms." Id. Although noting that whether electronic monitoring without physical trespass constitutes a search is a question for another day, Justice Sotomayor warned:

> More fundamentally, it may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties. E.g., Smith[ v. Maryland], 442 U.S.[ 735, 742 (1979)]; United States v. Miller, 425 U.S. 435, 443 . . . (1976). This approach is ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks. . . . . But whatever the societal expectations, they can attain constitutionally protected status only if our Fourth Amendment jurisprudence ceases to treat secrecy as a prerequisite for privacy. I would not assume that all information voluntarily disclosed to some member of the public for a limited purpose is, for that reason alone, disentitled to Fourth Amendment protection.

22

Id. at 957 (Sotomayor, J., concurring).

Thus, at the time that agents installed the pole camera in question in this case, silent video surveillance of unobstructed curtilage, which did not involve a physical trespass and did not permit law enforcement to see or discern what was happening within the home, was not deemed to be a search under the Fourth Amendment. Although five members of the Supreme Court in Jones questioned the constitutionality of extended electronic monitoring of a vehicle,[6] the opinion did not contradict the Court's prior reasoning in Ciraolo that the Fourth Amendment does not require officers to ignore what any passerby can view from a public street. See Ciraolo, 476 U.S. at 213.

On December 19, 2012, the Court of Appeals for the Sixth Circuit affirmed the convictions of a former mail carrier relating to misrepresentations regarding her physical abilities in order to receive disability payments. United States v. Anderson-Bagshaw, No. 12-3074, 2012 WL 6600331 (6th Cir. Dec. 19, 2012) (not for publication in Federal Reporter), cert. denied No. 12-9360, 2013 WL 1187001 (Apr. 22, 2013). Although agents conducted some in-person, physical surveillance of the defendant, including while she was on a cruise, physical surveillance of her home was challenging because she lived on a busy highway in a rural area and the view of her backyard from the road was blocked by foliage. Id. at 3. Agents installed a video camera on a utility pole by the public highway in front of the defendant's home. Id. The pole camera, which streamed a live image to agents over the internet for just over three weeks, could pan and zoom but could not view the inside of the defendant's house or barn. Id.

---

[6]Justice Sotomayor observed that the "unique attributes of GPS surveillance" must be considered because "GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations." Jones, 132 S. Ct. at 955.

23

The Sixth Circuit acknowleged that "[l]aw enforcement officers may observe a home's curtilage 'from a public vantage where [they] have a right to be and which renders the activities clearly visible.'" Id. at *6 (quoting Ciraolo, 476 U.S. at 213). The court found that the view from pole camera "was equally as good from the ground level" and that "the camera was placed at the top of the pole for technical reasons, and not to improve the vantage point." Id. at *7. Nevertheless, the court expressed its "misgivings about a rule that would allow the government to conduct long-term video surveillance of a person's backyard without a warrant[,]" because a resident would not expect that "the government can constantly film their backyard for over three weeks using a secret camera that can pan and zoom and stream a live image to government agents." Id. The court opined that such a scenario "'provokes an immediate negative visceral reaction'" reminiscent of the Orweillian state. Id. (quoting Cuevas-Sanchez, 821 F.2d at 251). "Ultimately," given the evidence from the physical surveillance of the defendant, the court held "that any possible Fourth Amendment violation here would be harmless" and "decline[d] to decide whether long-term video surveillance of curtilage requires a warrant." Id. (stating that it would not announce a "new rule" where any Fourth Amendment violation was harmless).[7]

After surveying this case law, the Court finds that although officers may view curtilage by video camera if they could enjoy the same view in person, both live and remote surveillance are circumscribed by the Fourth Amendment. First, a video camera cannot be used to look inside or

---

[7]In her concurring option, Judge Karen Nelson Moore stated that she "would hold that the video surveillance obtained using the pole camera in this case was an unreasonable search which violated [the defendant's] Fourth Amendment rights." Id. at *25. Judge Moore opined that continuous and long-term video surveillance is "different from and far more intrusive" than physical police surveillance or limited police flyovers because it renders law enforcement's presence invisible, allowing officers to observe more than they could in person. Id. at *23-25.

24

otherwise reveal what is occurring inside a residence. <u>Kyllo v. United States</u>, 533 U.S. 27, 40 (2001) (holding that "[w]here, as here, the Government uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a 'search' and is presumptively unreasonable without a warrant"). Second, a video camera cannot be used to overcome a physical barrier–either natural or constructed–that would block an officer's physical observation of the curtilage from a public street. <u>See Cuevas-Sanchez</u>, 821 F.2d at 251. Third, the Court questions whether a video camera can be used to track continuously and indefinitely (i.e., without a time limitation) a person's every movement within their curtilage–a location entitled to the same Fourth Amendment protection as the home–without law enforcement first submitting the duration and circumstances of the surveillance for neutral judicial review.[8] <u>See Anderson-Bagshaw</u>, 2012 WL 6600331, *7. The Court will now apply these factors to the case at hand.


*(2) Application*

First, the Court must determine whether the location monitored by the instant pole camera was curtilage. Whether an area constitutes curtilage is determined by looking to "the unique facts of each case." <u>Anderson-Bagwell</u>, 2012 WL 6600331, at *6; <u>Daughenbaough v. City of Tiffin</u>, 150 F.3d 594, 598 (6th Cir. 1998). Each case is evaluated in light of four factors:

(1) the proximity of the area claimed to be curtilage to the home, (2)

---

[8]The appellate court in <u>Anderson-Bagshaw</u> did not provide guidance on how a search warrant must limit and regulate extended video surveillance in order to comply with the Fourth Amendment. In this regard, the Court agrees with the Fifth Circuit in <u>Cuevas-Sanchez</u> that the statutory protections provided in Title III with regard to wiretaps would serve to protect the constitutional rights of those subjected to video surveillance as well. 821 F.2d at 251-52.

25

whether the area is included within an enclosure surrounding the home, (3) the nature of the uses to which the area is put, and (4) the steps taken by the resident to protect the area from observation by people passing by.

United States v. Dunn, 480 U.S. 294, 301 (1987); Anderson-Bagwell, 2012 WL 6600331, at *6. Nevertheless, the primary consideration is "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." Dunn, 480 U.S. at 301; Anderson-Bagwell, 2012 WL 6600331, at *6.

In the instant case, based upon an aerial photograph [Exh. 1] introduced at the suppression hearing, the Court finds that most of the area within the view of the pole camera was pasture land or fields. The Defendant does not have a reasonable expectation of privacy in the open fields on the Houston property. See Oliver, 466 U.S. at 178; Anderson-Bagshaw, 2012 WL 6600331, at *6 (holding that video surveillance of barnyard and pasture "did not constitute a Fourth Amendment search"). The Court finds that four of the sightings of the Defendant's brother Rocky Houston in possession of a firearm during the relevant time period occurred in the open fields on the Houston property. Agent Dobbs' affidavit supporting the search warrant for the pole camera states that (1) on October 20, 2012, Rocky Houston "was observed in the field across from the farmhouse [at 412 Barnard Narrows Road] with what appeared to be a rifle" [Doc. 17, Exh. 4, p.12, ¶19], (2) also on October 20, 2012, Rocky Houston "was seen driving a tractor to the field beside 391 Barnard Narrows Road. While stopped at the end of the driveway, he held what appeared to be a rifle up to his shoulder" [Doc. 17, Exh. 4, p.12, ¶20], (3) on November 5, 2012, Rocky Houston "was observed with what appeared to be a rifle across the road from 391 Barnard Narrows Road" [Doc. 17, Exh. 4, p.13, ¶24] , and (4) on November 20, 2012, Rocky Houston "was observed walking from his

residence located at 373 Barnard Narrows Road to 391 Barnard Narrows Road with what appeared to be a rifle slung over his shoulder" [Doc. 17, Exh. 4, p.14, ¶27]. The Court finds that this video footage is not subject to suppression.

The area immediately adjacent to the Defendant's mobile home at 391 Barnard Narrows Road, however, must be analyzed with regard to the four factors enumerated in <u>Dunn</u>. This area is in close proximity to the mobile home, which supports a finding that it is curtilage. The second factor examines whether the area is contained within an enclosure. Although the Court cannot tell from the aerial photograph whether the area in close proximity to the mobile home is fenced, any fencing in no way blocks the view of the residence and curtilage from either Barnard Narrows Road or Dogtown Road. From the aerial photograph, the foliage around the front of the mobile home appears to create a natural enclosure on the side of the residence closest to Barnard Narrows Road. <u>Anderson-Bagshaw</u>, 2012 WL 6600331, at *6 ("[n]atural barriers can form an 'enclosure' for purposes of curtilage"). However, Agent Dobbs testified that an individual traveling on Barnard Narrows Road would have a clear view of the front of the Defendant's mobile home. Accordingly, this second factor argues against treating the area surrounding the mobile home as curtilage.

The third <u>Dunn</u> factor looks to the uses to which the area is put. The Court has little information as to the nature of the uses to which the area in close proximity to the mobile home is put, aside from Agent Dobbs' testimony that the Defendant and Rocky Houston were observed target shooting in this area. Finally, the fourth factor considers the efforts of the property owner to protect the area from the view of those passing by. The Court knows of no precautions that the Defendant has taken to prevent others from observing the yard immediately around the mobile home. In fact, the Defendant has invited the public to look onto the property in front of his mobile home by posting

27

a series of large signs or billboards with statements about public officials on the property near the road.[9]  Although only one of the Dunn factors clearly supports treating the area as curtilage, the Court finds that the yard around the mobile home is "intimately tied" to the mobile home itself and is, therefore, within the curtilage of the residence.  The Court makes this finding in the Defendant's favor in order to give the greatest protection possible to his constitutional rights, even though the Defendant's own conduct in inviting the public to view his property argues against such a finding.

The Court's "conclusion that the [yard immediately adjacent to the mobile home] is curtilage does not end [the] analysis, since law enforcement officers are entitled to observe things in plain sight from publicly accessible areas."  Anderson-Bagshaw, 2012 WL 6600331, at *6.  However, the agents are only allowed to observe whatever any passer-by could see from the streets.  Based upon the testimony of Agent Dobbs, the Court finds that the pole camera enjoyed the same view of the Defendant's curtilage that could be seen by someone standing on the ground along either Barnard Narrows Road or Dogtown Road.  Although Agent Dobbs testified that the Johnson residence blocked the view of the Defendant's home from the ground at the utility pole on which the pole

---

[9]On April 19, 2013, the Defendant filed a document entitled Evidence in Case No. 3:13-CR-10 [Doc. 82] and containing twelve photographs with no caption or supporting explanation. The Court infers that the majority of these photographs are close ups of the billboards on Leon Houston's property.  These signs, which are written in all capital letters, primarily contain a list of persons designated as "terrorist[s]" and complaints about various public officials. One photograph depicts a portion of a barbed wire fence at an unknown location.  Another picture is of a water heater tank bearing Leon Houston's house number and what appears to be a no trespassing sign.  Exhibit 2 introduced at the April 16, 2013 motion hearing in this case is a photograph of the driveway to the Defendant's residnece taken from the pole camera.  This photograph shows what shows appears to be a water heater tank on the grass at the corner of the intersection of Leon Houston's driveway and Barnard Narrows Road.  To the extent that these photographs submitted by the Defendant are relevant to his suppression motions, the Court finds that they show that the Defendant invited the public to look at the property by posting large signs near the road.

28

camera was located, he also stated that the Defendant's residence could be seen from Dogtown road on either side of the Johnson house. Accordingly, the Court finds the fact that the instant camera was located atop a utility pole did not provide law enforcement with a vantage point that they could not have had from the ground. See Anderson-Bagshaw, No. 12-3074, 2012 WL 6600331, at *7 (finding that the camera was not placed on a utility pole to give the officers a view of the curtilage that they did not have from the ground); cf. Cuevas-Sanchez, 821 F.2d 248 at 251 (observing that the camera allowed the officers to see over the fence). Moreover, the instant pole camera could not be used to view the inside of the Defendant's residence. Accordingly, video footage of the curtilage surrounding 391 Barnard Narrows Road is not subject to suppression, provided that the duration and circumstances of the video recording are reasonable.

Although the precise length of reasonable warrantless video surveillance has not been established, the Sixth Circuit in Anderson-Bagwell has suggested that three weeks is too long. No. 12-3074, 2012 WL 6600331, at *7 (observing that "few people . . . would expect that the government can constantly film their backyard for over three weeks" without a search warrant); see also Jones, 132 S.Ct. at 964 (Alito, J., concurring in jmt) (observing that the Court "need not identify with precision the point at which the tracking of this vehicle became a search, for the line was surely crossed before the 4-week mark"). Additionally, the Court has no information that the agents attempted to limit the intrusiveness of the video surveillance, other than limiting monitoring of the camera primarily to "daylight hours." [Doc. 15, Doc. 17, Exh. 4, p.11, ¶14] For example, neither the testimony at the hearings nor Agent Dobbs' affidavits state that the agents stopped monitoring the camera when others besides the Defendant and his brother Rocky Houston were at the property. Accordingly, the Court finds that the warrantless video surveillance of the curtilage of 391 Barnard

Narrows Road, beyond fourteen (14) days violated the Defendant's reasonable expectation of privacy.

*(3) Good Faith*

The Government contends that the Defendant's arguments for suppression of all evidence stemming from the pole camera footage turns upon the propriety of the warrantless surveillance from October 9 through December 19, 2012. It argues that during that time and up until the Sixth Circuit's opinion in United States v. Anderson-Bagshaw, *no court* had ever held that agents must first seek a search warrant before installing a pole camera on a public utility pole. Instead, other courts had upheld such warrantless surveillance. Jackson, 213 F.3d at 1280; Urbina, 2007 WL 4895782, *7. Thus, the Government concludes that the instant ATF agents could not have known that a search warrant was required, prior to the Anderson-Bagshaw opinion. The day that the Anderson-Bagshaw opinion was entered, ATF Agent Dobbs sought a search warrant for the continued use of the pole camera, even though the discussion of video surveillance in Anderson-Bagshaw was dicta. The Government argues that because the agents acted in reliance on the fact that no legal precedent required a search warrant for video surveillance of curtilage prior to December 19, 2012, the exclusionary rule should not be employed to suppress the video footage in this case.

"The general remedy for a Fourth Amendment violation is that evidence obtained due to the unconstitutional search or seizure is inadmissible." United States v. Dice, 200 F.3d 978, 983 (6th Cir. 2000); see also Mapp v. Ohio, 367 U.S. 643, 654 (1961) (holding that "all evidence obtained by an unconstitutional search and seizure [is] inadmissible in federal court"); Weeks v. United States, 232 U.S. 383, 398-99 (1914) (establishing the exclusionary rule as the remedy for violations

30

of the Fourth Amendment).  However, not every Fourth Amendment violation results in the exclusion of the evidence obtained.  See Herring v. United States, 129 S. Ct. 695, 700 (2009). Exclusion of evidence is "a judicially created rule . . . 'designed to safeguard Fourth Amendment rights generally through its deterrent effect.'" Id. at 699 (quoting United States v. Calandra, 414 U.S. 338, 348 (1974)).  The exclusionary rule applies only where "its remedial objectives are thought most efficaciously served," Evans, 514 U.S. at 11, and where it "results in appreciable deterrence." Herring, 129 S. Ct. at 700 (quoting United States v. Leon, 468 U.S. 897, 909 (1984)) (internal quotation marks omitted).  "[T]o the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against [its] substantial social costs."  Herring, 129 S. Ct. at 700 (quoting Illinois v. Krull, 480 U.S. 340, 352-53 (1987)).  In the end, the decision to suppress evidence "turns on the culpability of the police and the potential for exclusion to deter wrongful police conduct."  Id. at 698.

Thus, the courts have recognized that certain Fourth Amendment violations do not involve law enforcement officers' own misconduct and that excluding evidence in those cases would not deter wrongful police conduct.  As such, a number of "good faith" exceptions to the exclusionary rule have developed.  These include (1) reliance on a search warrant that is later found to be unsupported by probable cause, Leon, 468 U.S. at 922; (2) reliance on a search warrant that contains clerical errors, Massachusetts v. Sheppard, 468 U.S. 981, 991 (1984); (3) reliance on a statute with a constitutional defect that was not "sufficiently obvious," Krull, 480 U.S. at 349-50; and (4) reliance on mistaken data or information from a judicial employee, Arizona v. Evans, 514 U.S. 1, 15 (1995). See also Herring, 129 S. Ct. at 701.  In Davis v. United States, the Supreme Court recently recognized a good faith exception for officers "conduct[ing] a search in objectively reasonable

31

reliance on binding judicial precedent[.]" 131 S. Ct. 2419, 2428-29, 2434 (2011).

Here, at the time that ATF agents installed the pole camera to conduct video surveillance of the Houston family property, no court had required a search warrant to conduct video surveillance of unobstructed curtilage. On the other hand, the Court of Appeals for the Tenth Circuit and the District Court for the Eastern District of Wisconsin had both affirmed warrantless video surveillance. Jackson, 213 F.3d at 1280; Urbina, 2007 WL 4895782, *7. Notably, the Supreme Court in Jones had held that the installation and monitoring of a GPS tracking device is a search despite the fact that the device only disclosed information that was already displayed to the public. However, the Jones decision was limited to GPS trackers, which Justice Sotomayor observed reveal more about the intimate associations of the individual than "lawful conventional surveillance techniques." Jones, 132 S. Ct. at 955-56 (Sotomayor, J, concurring). Lawful video surveillance of curtilage, on the other hand, should reveal only the same information that could be gained by in-person or conventional police surveillance. Thus, the Court questions whether even the most foresighted agent would have viewed Jones as an indication that a search warrant was required for a pole camera.

In any event, the Court finds that the ATF agents acted in good faith in the instant case. They had no prior precedent stating that a search warrant was required, and they sought a search warrant the day that the Sixth Circuit filed the Anderson-Bagwell case. Like the officers in Davis, the instant ATF agents "did not violate [the Defendant's] Fourth Amendment rights deliberately, recklessly, or with gross negligence." Id. at 2428. Thus, suppression of the video footage in this case would not serve to deter future Fourth Amendment violations. Moreover, the societal cost of suppressing "reliable, trustworthy evidence bearing on guilt or innocence" would be high. Id. at 2427. Accordingly, the Court finds that the "deterrence benefits from suppression" do not outweigh the

cost to society, see id., and the exclusionary rule should not be applied in this case. The Court recommends that the Defendant's motion to suppress the footage from the warrantless video surveillance be denied.

### B. December 19, 2012 Search Warrant Authorizing Pole Camera

On December 19, 2012, ATF Agent Jason Dobbs sought a search warrant authorizing the continued video surveillance of the Houston family property from the pole camera already in use. United States Magistrate Judge H. Bruce Guyton issued a search warrant for the continued use of the pole camera on that same day. The Defendant asks the Court to suppress the video footage gained after December 19, 2012, because he contends that the search warrant (1) was not issued by a neutral and detached judge and (2) was not supported by probable cause.

*(1) Neutral and Detached Magistrate*

To comport with the Fourth Amendment, the judge issuing a search warrant must be "neutral and detached." Shadwick v. City of Tampa, 407 U.S. 345, 350 (1972); United States v. Beals, 698 F.3d 248, 264 (6th Cir. 2012). "Whatever else neutrality and detachment might entail, it is clear that they require severance and disengagement from activities of law enforcement." Shadwick, 407 U.S. at 350. A search pursuant to a warrant issued by a judicial officer lacking in neutrality "stands on no firmer ground than if there had been no warrant at all." Coolidge v. New Hampshire, 403 U.S. 443, 453 (1971). In order to determine whether the issuing judge was neutral and detached, the Court looks to the particular circumstances involved in the issuance of the search warrant in question. United States v. Guthrie, 184 F. App'x 804, 806 (10th Cir. 2006).

33

The Defendant argues that Judge Guyton could not issue the instant search warrant because he had a conflict of interest. He contends that this alleged conflict arises from the fact that on January 17, 2012, the Defendant filed a federal civil rights complaint, <u>Clifford Leon Houston v. James F. Logan Jr., et al.</u>, 3:12-mc-2, naming Judge Guyton as one of numerous defendants and claiming damages in the amount of $25,000,000. The Government responds that the Defendant has failed to show any bias or prejudice on the part of Judge Guyton.

"The Sixth Circuit has identified two situations in which a magistrate will not be considered 'neutral and detached': (1) when she has a personal, direct or monetary interest in the outcome of the case; or (2) she is acting primarily in a law-enforcement capacity." <u>United States v. Todd</u>, No. 3:05cr00090, 2008 WL 542972, *4 (M.D. Tenn. Feb. 25, 2008) (citing <u>United States v. Bowers</u>, 828 F.2d 1169, 1174-75 (6th Cir. 1987)). Moreover, the "'judge's alleged bias must emanate from some extrajudicial source rather than from participation in judicial proceedings.'" <u>Id.</u> (quoting <u>Bowers</u>, 828 F.2d at 1175); <u>see also</u> <u>United States v. Montgomery</u>, 395 F. App'x 177, 186 (6th Cir. 2010) (observing that "opinions formed by judges based on what they learned in earlier proceedings does not qualify as bias or prejudice"). In <u>Todd</u>, the defendant argued that the judge issuing the search warrant was not neutral and detached because she had previously decided that he was not credible, based upon his testimony before her in another case. <u>Id.</u> The court found that Todd's allegation (that the judge had previously formed a negative opinion of his credibility) did not show "a personal or direct interest in the outcome of his case" or that the judge was acting essentially as law enforcement. 2008 WL 542972, at *4. Moreover, the judge's opinion of Todd's credibility had no bearing upon whether she found the affiant to be credible, and the court found that the search warrant was "clearly supported by probable cause." <u>Id.</u> Thus, the court in <u>Todd</u> held that the allegations of bias were "not

34

sufficient to overcome the presumption that [the judge] acted as a 'neutral and detached magistrate' when she issued the search warrant." Id. at *5.

In the instant case, the Defendant suggests that Judge Guyton was not neutral and detached because, at the time he signed the search warrant, the Defendant's pending civil lawsuit against Judge Guyton caused him to have a personal and monetary interest in the outcome of a future criminal prosecution of the Defendant.[10] The Court disagrees. First, ATF sought the search warrant authorizing the continued use of the pole camera to investigate the crimes of the Defendant's brother Rocky Houston, not the Defendant. The potential future criminal prosecution of Rocky Houston is wholly unrelated to the Defendant's civil complaint naming Judge Guyton. Second, the Defendant's bare allegation that Judge Guyton was biased by the Defendant's pending civil lawsuit is unfounded. The Defendant's civil lawsuit was dismissed due to the Defendant's failure to pay the filing fee three and one-half months before Judge Guyton signed the instant search warrant.[11] Thus, the Defendant

---

[10]The Court analyzes in a separate Report and Recommendation on the Defendant's motions to dismiss the charges whether Judge Guyton's recusal in a prior civil case (3:12-mc-2) requires his disqualification in all subsequent cases involving the Defendant, and finds that it does not. A judge's recusal in a case does not automatically require his or her disqualification in a subsequent case. See Communities for Equity v. Mich. High School Athletic Ass'n, 459 F.3d 676, 698 (6th Cir. 2006); see also United States v. Partin, 312 F. Supp. 1355, 1358 (E.D. La. 1970) (oberving that "[t]he fact that the Court felt that the ends of justice would best be served by recusation in that particular case can, of course, have no bearing on the Court's refusal to recuse itself in the present instance[, which ] . . . involves only this one defendant, and . . . an entirely different charge"). In fact, the Sixth Circuit has expressly held with regard to this Defendant that a judge's recusal in a prior case is not an extrajudicial activity, nor an event causing a reasonable person to question the judge's impartiality, and, thus, is not a basis for the judge's recusal in an unrelated case. Clifford Leon Houston v. Wicks, No. 11–6557, 2012 WL 5259166 (6th Cir. Oct. 25, 2012).

[11]Clifford Leon Houston v. James F. Logan Jr., et al., 3:12-mc-2 [Doc. 5], was terminated on August 30, 2012, due to his failure to pay the filing fee or to move to proceed *in forma pauperis*. See also Clifford Leon Houston v. Jack Stockton, et al., 3:11-mc-25 [Doc. 3 at 13].

35

has failed to demonstrate that Judge Guyton had a personal, direct, or monetary interest in the outcome of the instant case and has not overcome the presumption that Judge Guyton was neutral and detached. Additionally, like the search warrant in Todd, the December 19, 2012 search warrant is supported by probable cause as discussed below.[12]

*(2) Probable Cause*

The Defendant also argues that probable cause did not exist to support the issuance of the December 19, 2012 search warrant authorizing the continued use of the pole camera. He argues that the information gained in violation of his Fourth Amendment rights during the warrantless pole camera surveillance cannot be considered in assessing probable cause. He contends that once the information from the video surveillance is removed from the search warrant affidavit, the remaining information from his sisters and a confidential informant fails to provide probable cause because the search warrant affidavit does not show that these individuals are reliable or that law enforcement corroborated their information. The Government responds that the search warrant is supported by probable cause, even without considering the warrantless video footage.

As set out above, the Fourth Amendment requires probable cause for the issuance of a search warrant. Probable cause to search is "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). To make

_____

[12]A search warrant issued by an individual without the legal authority to do so is "void *ab initio*," United States v. Master, 614 F.3d 236, 241 (6th Cir. 2010), which means that the Court never reaches the question of whether the search warrant is supported by probable cause. In this case, the Defendant does not contend that Judge Guyton lacked the legal authority to issue search warrants, only that his alleged bias against the Defendant prevented him from exercising that authority in a neutral fashion.

such a showing "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Id. at 244 n.13. Thus, the Supreme Court has observed that

> probable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would "warrant a man of reasonable caution in the belief," Carroll v. United States, 267 U.S. 132, 162, . . . (1925), that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false. A "practical, nontechnical" probability that incriminating evidence is involved is all that is required. Brinegar v. United States, 338 U.S. 160, 176, . . . (1949).

Texas v. Brown, 460 U.S. 730, 742 (1983). In other words, probable cause is "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion." United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990). Whether probable cause to issue a search warrant exists is evaluated by looking at the totality of the circumstances. Gates, 462 U.S. at 238.

The issuing judge's determination that probable cause exists is entitled to "'great deference.'" United States v. Allen, 211 F.3d 970, 973 (6th Cir. 2000) (quoting Gates, 462 U.S. at 236). This deferential standard promotes the preference for the use of search warrants as opposed to warrantless searches. Id. "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Gates, 462 U.S. at 238. The "duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." Id. at 238-39. In making this determination, the Court considers only the information that was before the issuing judge–in other words, only what is contained within the four corners of the supporting affidavit. United States v. Hatcher, 473 F.2d 321, 323 (6th Cir. 1973); see also Whiteley v. Warden, 401 U.S. 560, 565 (1971).

The Court has determined above that although eight of the ten weeks of the warrantless video footage of the Defendant's curtilage were gained in violation of the Defendant's Fourth Amendment rights due to the excessive duration of the warrantless video surveillance. Nevertheless, the Court also found that this video footage should not be subject to the exclusionary rule because the agents acted in good faith reliance on the absence of any court requiring a search warrant for long-term video surveillance of unobstructed curtilage. Therefore, the Court finds that the video footage from October 10, 2012, to December 19, 2012, does not have to be removed from consideration and provides probable cause to issue the search warrant authorizing continued use of the pole camera. According to the search warrant affidavit, this video footage shows the Defendant's brother, Rocky Houston, who is a convicted felon, carrying and/or shooting firearms on the Houston family property on fourteen different days between October 11, 2012, and December 18, 2012. The affidavit also states that, based upon Agent Dobbs prior training and experience, persons possessing firearms generally keep those firearms for years and often for a lifetime. [Doc. 17, Exh. 4, p.14, ¶31] Thus, considering the warrantless video footage in full, the affidavit clearly provides probable cause that continuing video surveillance of the Houston family property would yield evidence of Rocky Houston being in possession of a firearm as a convicted felon in violation of 18 U.S.C. §922(g). However, even if the Court only considers the video footage of Rocky Houston carrying and shooting weapons in the open pasture and within the Defendant's curtilage during the first two weeks that the property was filmed (from October 9 to October 23, 2012), the search warrant affidavit would provide probable cause to support the issuance of a search warrant authorizing continued video surveillance, as discussed below.

First, the search warrant affidavit provides information that Rocky Houston possessed a

firearm in the pasture areas of the farm on four occasions: (1) on October 20, 2012, Rocky Houston "was observed in the field across from the farmhouse [at 412 Barnard Narrows Road] with what appeared to be a rifle" [Doc. 17, Exh. 4, p.12, ¶19], (2) also on October 20, 2012, Rocky Houston "was seen driving a tractor to the field beside 391 Barnard Narrows Road. While stopped at the end of the driveway, he held what appeared to be a rifle up to his shoulder" [Doc. 17, Exh. 4, p.12, ¶20], (3) on November 5, 2012, Rocky Houston "was observed with what appeared to be a rifle across the road from 391 Barnard Narrows Road" [Doc. 17, Exh. 4, p.13, ¶24], and (4) on November 20, 2012, Rocky Houston "was observed walking from his residence located at 373 Barnard Narrows Road to 391 Barnard Narrows Road with what appeared to be a rifle slung over his shoulder" [Doc. 17, Exh. 4, p.14, ¶27]. Additionally, the search warrant affidavit relates that Rocky Houston was filmed (1) target shooting in front of 391 Barnard Narrows Road on October 11, 2012, (2) walking to the side and rear of the trailer with a rifle on October 15, 2012; (3) target shooting in front of the trailer on October 20, 2012; and (4) standing outside the trailer with a handgun in his waistband on October 23, 2012. [Doc. 17, Exh. 4, pp.11-12, ¶¶16-17, 20-21] As discussed above, the affidavit relates that individuals tend to retain firearms for years. Video footage of Rocky Houston's possession of firearms on the Houston family property on six days in October and November 2012, supports a finding that continued video surveillance of the area would provide additional footage of the Defendant possessing firearms.

Second, the affidavit provides information that on December 16, 2011, the Defendant's sister Lisa Burris told Roane County Sheriff Jack Stockton and District Attorney General Russell Johnson that whenever Rocky Houston left the family farm, "he was usually armed with a firearm" and that "there were numerous firearms on the property[.]" [Doc. 17, Exh. 4, p.8, ¶6] The affidavit states that

39

Ms. Burris requested a meeting with Sheriff Stockton and General Johnson because she believed that the Defendant and Rocky Houston were not properly caring for the siblings' elderly father. [Doc. 17, Exh. 4, p.8, ¶6] The affidavit relates that in investigating this complaint by Ms. Burris, General Johnson interviewed a home healthcare nurse Ashley Long, who stated she had seen multiple firearms on the property in July 2011 while there caring for the Defendant's father. [Doc. 17, Exh. 4, p.8, ¶7] Although Ms. Long recalled that the Defendant was always armed when she saw him, she did not recall seeing Rocky Houston with a gun on his person. [Doc. 17, Exh. 4, p.8, ¶7] The Court finds that this evidence lends support to a finding that continuing video surveillance of the Houston family property would disclose evidence of Rocky Houston possessing firearms because it shows that numerous firearms were present on the property and that Rocky Houston armed himself when leaving the property.

The Defendant challenges the use of this evidence in the probable cause equation, arguing that Ms. Burris is biased against him and that neither Ms. Burris nor Ms. Long are shown to be credible, reliable or corroborated by the police. The Court finds that the information from Ms. Burris and Ms. Long was properly considered in the probable cause analysis. The fact that Ms. Burris had complained to law enforcement about the Defendant's care of their father is contained in the affidavit for the issuing judge to evaluate. Additionally, the credibility or reliability of known citizen witnesses does not have to be proven for their information to be considered. "Statements from a source named in a warrant application . . . are generally sufficient to establish probable cause without further corroboration because the legal consequences of lying to law enforcement officials tend to ensure reliability." United States v. Lonnie Hodge, No. 12-1173, 2013 WL 1694437, *4 (6th Cir. Apr. 19, 2013); see also United States v. Miller, 314 F.3d 265, 269–70 (6th Cir. 2002); United States

40

v. Pelham, 801 F.2d 875, 878 (6th Cir. 1986). Finally, although Ms. Burris and Ms. Long observed the firearms on the Houston family property more than a year before the search warrant was requested, guns have an enduring value to those who possess them and are likely to be retained for long periods of time. See United States v. Lancaster, No. 04-5826, 2005 WL 1799385, *5 (6th Cir. July 28, 2005) (determining that information from a confidential informant that he saw the defendant fire a machine gun two years earlier was not stale because "firearms are not perishable items"). Moreover, the observations of Ms. Burris and Ms. Long are corroborated by multiple sightings of Rocky Houston carrying a firearm in October and November 2012. Accordingly, the Court finds that the information from Ms. Burris and Ms. Long is properly considered along with the totality of the evidence.

The affidavit in support of the search warrant also provides the following information from an interview with a confidential informant "who is a long-time acquaintance" of the Defendant and his brother and who was last on the Houston family property in April 2012: (1) The confidential informant has seen between fifteen and twenty firearms in both the Defendant's and Rocky Houston's residences, (2) Rocky Houston carries two pistols in his waistband at all times, and (3) Rocky Houston is always armed when he leaves his property. [Doc. 17, Exh. 4, p.9, ¶¶10-11] The affidavit relates that the confidential informant "has a criminal history and has served time in jail for criminal violations, therefore [the affiant] treat[s] him as an individual under the law whose credibility and reliability must be established by other corroborating evidence." [Doc. 17, Exh. 4, p.9, ¶10] The affidavit provides the following corroboration of the confidential informant's information: (1) Roane County Sheriff's Office staff confirmed that Rocky Houston drives a Ford Ranger pickup truck and the Defendant drives a Chevrolet pickup truck that belonged to his father, as stated by the

41

confidential informant; (2) The Roane County Sheriff confirmed that Rocky Houston's wife works at United Community Bank, as stated by the confidential informant; (3) Agent Dobbs confirmed through viewing an aerial photograph of the property that the Houston brothers have barricaded the driveway, as stated by the confidential informant; and (4) Agent Dobbs verified that in April 2012, a plaintiff was awarded a $5.45 million dollar judgment against the Houston brothers, supporting the confidential informant's statement that the Houston brothers told him they had lost a lawsuit and feared law enforcement would try to take their property in relation to this. The Defendant argues that law enforcement only corroborated information that was readily available to the public.

Probable cause for the issuance of a search warrant may be gleaned from information provided by a confidential source but, in such cases, the issuing judge must have a basis for finding that the source is reliable or credible and was in a position to know the information provided, as part of the totality of the circumstances analysis. United States v. Dyer, 580 F.3d 386, 390 (6th Cir. 2009); see also Gates, 462 U.S. at 233 (holding that a confidential informant's reliability and basis of knowledge are "relevant considerations in the totality-of-the-circumstances analysis"); Allen, 211 F.3d at 972-73. An informant's veracity or reliability and basis of knowledge are not rigid categories. Id. Instead, deficiencies in one aspect can be made up by a strong showing in another. Gates, 462 U.S. at 232-33; Allen, 211 F.2d at 981. Additionally, information provided by a confidential informant can be independently corroborated by law enforcement. United States v. Jones, 159 F.3d 969, 974 (6th Cir. 1998). This independent police corroboration must be "substantial." United States v. Frazier, 423 F.3d 526, 532 (6th Cir. 2005). Police do not necessarily have to corroborate the criminal conduct observed by the informant; instead, corroboration of unincriminating facts can be sufficient to establish probable cause. Gates, 462 U.S. at 243-44. "It

is enough, for purposes of assessing probable cause, that 'corroboration through other sources of information reduced the chances of a reckless or prevaricating tale,' thus providing 'a substantial basis for crediting the hearsay.'" Id. at 244-45 (quoting Jones v. United States, 362 U.S. 257, 269, 271 (1960)).

In the instant case, the confidential source had a first hand or eyewitness basis of knowledge regarding Rocky Houston's possession of weapons.  The affidavit relates that he had "known the Houston brothers for many years," has been inside both the Defendant's and Rocky Houston's residences, and was last at the Houston family property in April 2012.  He knows that the Houstons keep multiple firearms in their residences because he has seen them there.  This fact is corroborated by the eyewitness account of Ashley Long, the home healthcare nurse who was in the Defendant's residence in July 2011, caring for the Defendant's father, and observed multiple firearms there. Additionally, the confidential informant's account that the Houston brothers go armed, always keeping two pistols in their waistbands, is corroborated by Nurse Long's statement that "Leon Houston was always armed, sometimes with as many as three handguns at his waist[.]" [Doc. 17, Exh. 4, p.8, ¶7] Also, the confidential informant's statement that the Houston brothers never leave their property unarmed is corroborated by information in the affidavit from the Defendant's sister Lisa Burris, who related to law enforcement that Rocky Houston usually carried a firearm whenever he left the family farm.  These examples reveal both that the affidavit provided substantial corroboration of the confidential informant's information and that the corroboration was not solely from public sources.

Additionally, the level of detail provided in the confidential source's information supports a finding that the source is reliable.  See United States v. Gunter, 551 F.3d 472, 480 (6th Cir. 2008)

43

(considering as a factor supporting the informant's reliability that he provided detailed information of ongoing drug sales); <u>United States v. McCraven</u>, 401 F.3d 693, 697 (6th Cir. 2005) (determining that "a detailed description of what the informant observed first-hand" is another "indicia of the informant's reliability"). In this case, the confidential informant provided detailed information about the weapons the Houston brothers carried on their person:

> [The confidential informant] said that both Leon and Rocky Houston always carry two pistols at all times, one in the front waistband and one in the back. Leon Houston carries a .40 or .45 caliber weapon in his back waistband, and a six-shot revolver in his front waistband. Rocky Houston carries .40 or .45 caliber weapons in a similar fashion.

The Court finds that the level of detail regarding the type of weapons carried by the Houstons and the location on their person where they carried these weapons supports the reliability of the confidential informant.

Finally, the affidavit contained independent police corroboration of some of the information provided by the confidential informant. As listed above, law enforcement corroborated the type of truck driven by the Defendant and his brother, Rocky Houston's wife's employer, that the Houston brothers had barricaded the Defendant's driveway with vehicles, and that the Houstons had a significant civil judgment against them. The Defendant rejects this corroboration as relating only to innocent information available from public sources or by observation from the street. As discussed earlier, law enforcement does not have to corroborate criminal activity in order to provide probable cause. <u>See</u> <u>Gates</u>, 462 U.S. at 243-45 & n.13. In fact, the Supreme Court rejected this very argument in the seminal probable cause case of <u>Illinois v. Gates</u>:

> The Illinois Supreme Court thought that the verification of details contained in the anonymous letter in this case amounted only to "the

corroboration of innocent activity," J.A. 12a, and that this was insufficient to support a finding of probable cause. We are inclined to agree, however, with the observation of Justice Moran in his dissenting opinion that "In this case, just as in <u>Draper</u>[ v. United States, 538 U.S. 307, 309 (1959)], seemingly innocent activity became suspicious in the light of the initial tip." J.A. 18a. And it bears noting that all of the corroborating detail established in <u>Draper</u>, *supra*, was of entirely innocent activity-a fact later pointed out by the Court in both <u>Jones v. United States</u>, 362 U.S. 257, 269-270 . . . (1960), and <u>Ker v. California</u>, 374 U.S. 23, 36 . . . (1963).

This is perfectly reasonable. As discussed previously, probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity. By hypothesis, therefore, innocent behavior frequently will provide the basis for a showing of probable cause; to require otherwise would be to *sub silentio* impose a drastically more rigorous definition of probable cause than the security of our citizens demands. We think the Illinois court attempted a too rigid classification of the types of conduct that may be relied upon in seeking to demonstrate probable cause. <u>See</u> <u>Brown v. Texas</u>, 443 U.S. 47, 52, n. 2 . . . (1979). In making a determination of probable cause the relevant inquiry is not whether particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to particular types of non-criminal acts.

<u>Id.</u> at 243 n.13. In this case, the Court finds that the degree of suspicion attached to the information and acts corroborated by law enforcement, particularly with regard to firearms stored at the Houston brothers' residences and the fact that Rocky Houston was continuously armed, is high.

Accordingly, based upon the confidential informant's firsthand basis of knowledge, the level of detail in his information, and the corroboration provided by the statements of Ms. Burris and Nurse Long as well as law enforcement's corroboration of some of the details provided by the confidential informant, the Court finds that the confidential informant is reliable. Thus, the information from the confidential informant can and does support a probable cause finding in this case.

45

Considering the totality of the circumstances, including the video footage of Rocky Houston carrying firearms in the open pasture; the video footage of Rocky Houston shooting and carrying firearms the weeks of October 9-23, 2012; and the information from Lisa Burris and the confidential informant that Rocky Houston went armed on the property, the Court finds that the issuing judge had ample basis to find probable cause to believe that the continued monitoring of the pole camera would provide evidence of Rocky Houston, a felon, in possession of firearms. This is true even if the video footage of the surveillance of the Defendant's curtilage from October 23 through December 18, 2012, is not considered. Accordingly, the Court recommends that the Defendant's request to suppress evidence from the December 19, 2012 search warrant be denied.

## C. January 11, 2013 Search Warrant

Finally, the Defendant challenges the January 11, 2013, search of his residence pursuant to a search warrant because he contends that (1) the undersigned United States Magistrate Judge who issued the search warrant was not neutral and detached and (2) probable cause did not exist to issue the search warrant because the supporting affidavit fails to provide a nexus between evidence of Rocky Houston's illegal possession of firearms and the Defendant's home. The Court will examine each of these issues.

*(1) Neutral and Detached Judge*

The Defendant argues that the undersigned was not neutral and detached at the time I signed the search warrant for his residence on January 11, 2013. He asserts that at that time, the undersigned had a "special interest" [Doc. 57] in the search of his home because the Defendant had

sued me in 2003 in <u>Clifford Leon Houston v. John Ashcroft, et al.</u>, 3:03-cv-127. As set out above, two circumstances exist in which a judge issuing a search warrant "will not be considered 'neutral and detached': (1) when she has a personal, direct or monetary interest in the outcome of the case; or (2) she is acting primarily in a law-enforcement capacity." <u>Todd</u>, No. 3:05cr00090, 2008 WL 542972, at *4. Additionally, the purported bias of the issuing judge must stem from an extrajudicial source, not from the judge's involvement in judicial proceedings. <u>Id.</u> The Defendant's contention that the undersigned had a special interest relates to the first circumstance, which is whether the undersigned had a personal, direct, or monetary interest in the outcome of the Defendant's case. As discussed with regard to Judge Guyton's issuance of the December 19, 2012 search warrant above, the instant search warrant was to discover evidence of *Rocky Houston's* illegal possession of firearms, not to discover evidence of crimes by the Defendant. The search for evidence of the Defendant's brother's criminal activity is wholly separate from any interest the undersigned has in a civil lawsuit filed by the Defendant.

Additionally, the Court has already found [Doc. 88] with regard to the Defendant's numerous motions to recuse the undersigned that the mere fact that a litigant has filed a prior lawsuit against a judge does not in and of itself establish a personal bias on the part of the judge. <u>See</u> <u>In re Taylor</u>, 417 F.3d 649, 652 (7th Cir. 2005). The Seventh Circuit has explained:

> There is no rule that requires a judge to recuse himself from a case, civil or criminal, simply because he was or is involved in litigation with one of the parties. One reason for this policy is that a per se rule of disqualification would allow litigants to judge shop by filing a suit against the presiding judge. And even if litigation against a judge is not for the purpose of disqualification, recusal is not automatic because suits against public officials are common and a judge would likely not harbor bias against someone simply because the person named him in a meritless civil suit.

Id.  In the Defendant's 2003 civil lawsuit at issue, the undersigned was named along with numerous other defendants in the complaint, but the Defendant made no allegations relating to the undersigned, nor was my name even mentioned in the body of the complaint as having done any act.  Moreover, the District Court's October 10, 2003 dismissal of the lawsuit, Clifford Houston v. John Ashcroft, et al., 3:03-cv-127, Doc. 49, was affirmed by the Sixth Circuit in November 2004.  The lawsuit raised by the Defendant was dismissed some ten years before the issuance of the instant search warrant and has nothing to do with the present criminal charges or even the charges against the Defendant's brother.  Accordingly, the Court finds that the Defendant has failed to demonstrate that the undersigned had a personal, direct, or monetary interest in the issuance of the January 11, 2013 search warrant for the search of the Defendant's residence.  The Defendant has not overcome the presumption that the undersigned was neutral and detached at the time I issued the search warrant for the Defendant's residence.  See Todd, 2008 WL 542972, at *5 (observing that the issuing judge is presumed to be neutral and detached).

*(2) Probable Cause*

The Defendant also contends that Agent Dobbs' affidavit fails to provide probable cause for the issuance of the January 11, 2013 search warrant for his residence.  He argues that the affidavit does not provide a nexus between his residence and his brother's alleged possession of firearms.  He maintains that if the information gained from the illegal, warrantless video surveillance by the pole camera is excluded, then the only connection between his residence and his brother's possession of firearms is Agent Dobbs' belief that persons prohibited from possessing firearms will often hide them in family members' residences. [Doc. 19, Exh. 2, p. 17, ¶32] He argues that this belief by

48

Agent Dobbs is not corroborated by any other facts or circumstances related in the affidavit. Moreover, he asserts that even considering the information from the illegal, warrantless pole camera surveillance that Rocky Houston was spotted on numerous occasions possessing firearms around the Defendant's residence, the affidavit contains no information that Rocky Houston was ever seen in possession of a firearm inside the Defendant's home. Accordingly, the Defendant contends that the affidavit contains no evidence supporting the commission of a crime at the Defendant's home.

The Government responds that the affidavit in support of the search warrant states that a home healthcare nurse and a confidential informant had seen numerous weapons in the Defendant's residence. The affidavit also states that Rocky Houston was frequently inside the Defendant's residence. The Government argues that this information provides a nexus between the Defendant's residence and Rocky Houston's possession of firearms.

An affidavit offered in support of a search warrant "must indicate a nexus between the place to be searched and the evidence sought and this nexus may be established by the nature of the items and normal inferences of where a person would keep such items." United States v. Hawkins, 278 F. App'x 629, 634 (6th Cir.), cert. denied, 555 U.S. 1019 (2008); see also United States v. Carpenter, 360 F.3d 591, 594 (6th Cir. 2004). In the present case, the Court finds that the following information from Agent Dobbs' affidavit shows a nexus between the Defendant's residence and evidence of Rocky Houston's possession of firearms:[13]

(1) The confidential informant stated that he had been inside the

---

[13]Although, as discussed in Part A above, the Court has found that none of the video footage from the pole camera should be suppressed because the officers acted in good faith, here the Court considers only that footage obtained during the first two weeks (October 9 through 23, 2012) of monitoring, which the Court has found was not gained in violation of the Fourth Amendment.

49

Defendant's residence as recently as April 2012 and had observed between fifteen and twenty guns in the residence [Doc. 19, Exh. 2, p.11, ¶11],[14]

(2) Through monitoring the pole camera, law enforcement officers observed Rocky Houston frequenting the Defendant's residence daily, spending most of each day there, and staying overnight there on at least one occasion [Doc. 19, Exh. 2, p.13, ¶15],

(3) Through monitoring the pole camera on October 20, 2012, law enforcement saw Rocky Houston enter the Defendant's residence while carrying a rifle [Doc. 19, Exh. 2, p.14, ¶19];

(4) Through monitoring the pole camera, law enforcement observed Rocky Houston target shooting in front of the Defendant's residence on October 11, 2012 [Doc. 19, Exh. 2, p.13, ¶16] and on October 20, 2012 [Doc. 19, Exh. 2, p.14, ¶20];

(5) Through monitoring the pole camera, law enforcement saw Rocky Houston holding, carrying, or wearing a firearm on his person within the curtilage of the Defendant's residence on October 15, 2012 [Doc. 19, Exh. 2, p.14, ¶17]; October 20, 2012 [Doc. 19, Exh. 2, p.14, ¶19]; and October 23, 2012 [Doc. 19, Exh. 2, p.15, ¶21]; and

(6) Based upon his training and experience, Agent Dobbs knows that persons possessing firearms illegally "often attempt to conceal the location of firearms by hiding them in unusual places or by secreting them in friends' or family members' residences or vehicles." [Doc. 19, Exh. 2, p.17, ¶32].

The Court finds that this information in the search warrant affidavit establishes a nexus between the Defendant's residence and the firearms possessed by Rocky Houston. Numerous firearms were seen inside the Defendant's residence, a location where Rocky Houston went daily and spent the majority of each day. Officers saw Rocky Houston possess and shoot firearms within the Defendant's

---

[14]The Court observes that while the affidavit relates that both Nurse Long and the Defendant's sister Lisa Burris had personally observed multiple firearms on the Houston family property, the affidavit does not relate whether these firearms were observed inside the Defendant's residence. Thus, the Court considers the information from the confidential informant to be more relevant.

curtilage on five occasions within a two-week period and saw him carry a rifle into the Defendant's residence on one occasion. Finally, ATF Agent Dobbs' training and experience reveals that persons illegally possessing firearms often hide them at a family member's house. This information provides probable cause that firearms possessed by Rocky Houston would be found at the Defendant's residence. The Court recommends that the Defendant's motion to suppress the evidence gained from the January 11, 2013 search of his residence be denied.

### D. Stop and Seizure of the Defendant

Based upon the testimony of Investigator Mynatt and Agent Dobbs, the Court finds that while awaiting the issuance of search warrants on January 11, 2013, law enforcement agents on Rocky Houston's property saw the Defendant rapidly riding toward them on an ATV while armed. Agents drew their weapons, met the Defendant in the pasture, and ordered him to stop and get off the ATV. The Defendant complied and was removed from the ATV and handcuffed. An agent advised him of the Miranda warnings, and the Defendant agreed to talk to the agent. Law enforcement moved the Defendant to his brother's carport and interviewed him there. At some point during the conversation, the Defendant told law enforcement that earlier that evening, he had been "getting high and getting drunk." He also made a reference to using "wacky tobacco." The Defendant argues that his statements to law enforcement must be suppressed because they are the result of his illegal seizure.[15] He contends that law enforcement had no warrant or reasonable belief that exigent

_____

[15]The Defendant also calls [Doc. 47] for the suppression of *all* the prosecution's evidence against him, arguing that it results from his illegal seizure and is, thus, the fruit of the poisonous tree. The Court finds that the evidence seized during the search of the Defendant's home pursuant to a search warrant does not result from the seizure of the Defendant. Based upon the information before the Court, only the Defendant's statements made on the evening of January

51

circumstances existed requiring a protective sweep of Rocky Houston's house at the time they entered the Houston property.

The Government argues that the agents lawfully entered Rocky Houston's property to conduct a protective sweep for their own safety while awaiting the issuance of a search warrant. While they were lawfully on the property, the Defendant aggressively rode toward them on his ATV with three firearms. The Government argues that the Defendant was properly seized for officer safety. Finally, the Government maintains that the Defendant's statements are not subject to suppression because he was advised of the <u>Miranda</u> rights and he waived them before he was questioned.

Although both parties begin with an analysis of whether law enforcement properly entered Rocky Houston's property in order to secure the premises in anticipation of a search warrant, the Court finds this issue to be entirely beside the point. The Defendant has no legitimate expectation of privacy in his brother's home or curtilage and, thus, no basis to challenge the entry or search thereof. <u>See</u> <u>United States v. McNeal</u>, 955 F.2d 1067, 1071 (6th Cir. 1992). In <u>McNeal</u>, officers conducted a protective sweep of an apartment to secure it pending the arrival of a search warrant and, in the process, seized the defendant, who was retreating to a back bedroom, and searched his person. <u>Id.</u> at 1069. The appellate court held that while the defendant could potentially challenge the officers' search of his person, he did not have a legitimate expectation of privacy in the apartment where he was merely a visitor and could not challenge the protective sweep:

> [I]f [McNeal] had no reasonable expectation of privacy in Ward's apartment, his only remaining redress was to invoke the distinctively different Fourth Amendment constitutional prohibition against illegal

11, 2013, would be subject to suppression from an illegal seizure.

> detention of his person by proving that his warrantless arrest while on the premises of a third party wherein he had no expectation of privacy was without probable cause of sufficient weight to support a belief that he had committed a crime—legality of entry into Ward's apartment notwithstanding.

Id. at 1071.

In the instant case, the Court has no information that the Defendant had any privacy interest in his brother's residence, i.e., there is no evidence that he was an overnight guest there, a frequent visitor, kept clothing or personal items there, etc. See United States v. Heath, 259 F.3d 522, 533 (6th Cir. 2001) (determining that defendant had standing to contest the search of his cousin's apartment, because in addition to the familial relationship, the defendant had stayed there weekly for two years and had a key and "unfettered access" to the apartment); United States v. Pollard, 215 F.3d 643, 647-48 (6th Cir. 2000) (holding that one defendant had standing to challenge the search because he was a friend of the lessee, stayed at the residence occasionally, kept clothing there, and ate meals there, but that the codefendant, who had never been to the residence before, did not); United States v. Buckner 717 F.2d 297, 300 (6th Cir. 1983) (concluding that the defendant's relationship with the apartment lessee alone did not provide standing to contest the search of his mother's apartment).

"[A defendant] has the burden of establishing his standing to assert a Fourth Amendment violation." United States v. Smith, 263 F.3d 571, 582 (6th Cir. 2001). Here, the Defendant has failed to carry that burden. Accordingly, the Defendant may only challenge the seizure of his person, the legality of the officers' presence on Rocky Houston's property notwithstanding.

The Court must first determine when law enforcement seized the Defendant. Not every contact between a police officer and a member of the public is a seizure. United States v. Winfrey, 915 F.2d 212, 216 (6th Cir. 1990). "The Supreme Court has identified three types of reasonable, and

53

thus permissible, warrantless encounters between the police and citizens:

> (1) consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked questions; (2) a temporary involuntary detention or Terry stop which must be predicated upon "reasonable suspicion;" and (3) arrests which must be based upon "probable cause."

United States v. Pearce, 531 F.3d 374, 380 (6th Cir. 2008). A police-citizen encounter does not implicate the Fourth Amendment until some coercive or intimidating behavior occurs causing the defendant reasonably to believe that compliance is compelled. United States v. Collis, 766 F.2d 219, 221 (6th Cir.), cert denied, 474 U.S. 851 (1985). The test for when an individual has been seized is whether a reasonable person in those circumstances would have felt he or she was not free to leave. Michigan v. Chesternut, 486 U.S. 567, 573 (1988); United States v. Smith, 594 F.3d 530, 536 (6th Cir. 2010); United States v. Cooke, 915 F.2d 250, 252 (6th Cir. 1990). The evidence before the Court reveals that as the armed Defendant sped toward the officers on his ATV, they drew their guns and ordered him to stop. When he stopped, they removed him from his ATV and handcuffed him. The Court finds that at this point, the Defendant was seized within the meaning of the Fourth Amendment, because no reasonable person in these circumstances would have believed that he or she could have left. Thus, the Court must examine the officers' authority for seizing the Defendant at that point.

The Government contends [Docs. 33 and 76] that the warrantless arrest of the Defendant was proper. First, citing to Michigan v. Summers, 452 U.S. 652 (1981), the Government argues that the Defendant was properly seized for officer safety when he came riding toward the officers in an aggressive and dangerous manner. The Government argues that the agents advised the Defendant of the Miranda rights out of "an abundance of caution" [Doc. 76, p.8] From this argument, the Court

54

infers that the Government contends that the Defendant was not yet under arrest and so the advice of rights was not strictly necessary. The Government states that the Defendant agreed to talk with the agents and that "[d]uring a lengthy conversation, the defendant said that he had 'been getting high,' and 'getting drunk.'" [Doc. 76, p.8] The Government also states that when asked if his reference to "getting high" referred to using marijuana, the Defendant "made a reference to some 'wacky tobacco.'" [Doc. 76, p.8] The Government argues that these statements should not be suppressed because they were made after the Defendant was advised of his Miranda rights and waived them. Agents found marijuana residue and drug-smoking paraphernalia in the search the Defendant's trailer, and they encountered the odor of marijuana inside. The Government argues that because the Defendant was in possession of firearms when the agents detained him that evening, the agents had probable cause to arrest him for being an unlawful user of a controlled substance while in possession of firearms.

In Michigan v. Summers, the Supreme Court held that officers executing a search warrant to search for contraband may categorically detain the occupants of the location to be searched because such detention is minimally intrusive and serves to preserve officer safety, "prevent[] flight in the event that incriminating evidence is found," and effectuate the orderly execution of the search warrant. 452 U.S. 692, 703-05 (1981). "In executing a search warrant officers may take reasonable action to secure the premises and to ensure their own safety and the efficacy of the search." Los Angeles County v. Rettele, 550 U.S. 609, 614 (2007). Whether an officer's actions are reasonable is assessed using an objective standard. Id. The "safety risk inherent in executing a search warrant for weapons" also justifies handcuffing the occupants while they are detained. Muehler v. Mena, 544 U.S. 93, 100 (2005). The area within which the occupants may be detained incident to the

execution of the search warrant is confined to the "immediate vicinity of the premises to be searched." Bailey v. United States, 133 S. Ct. 1031, 1042 (2013); see also United States v. Bohannon, 225 F.3d 615, 616-17 (6th Cir. 2000) (holding that individuals speeding up to the house *during* the execution of the search warrant could properly be detained incident thereto). Factors relevant to defining that area include "the lawful limits of the premises, whether the occupant was within the line of sight of his dwelling, [and] the ease of reentry from the occupant's location." Bailey, 133 S. Ct. at 1042.

The problem with applying the Summers doctrine of detention incident to the execution of the search warrant to Defendant Houston's detention is that at the time that the Defendant was stopped, removed from his ATV, and handcuffed, the search warrants had not yet been issued. Agent Dobbs testified that while he was meeting with the undersigned Magistrate Judge in Knoxville, he received a call from agents at the Houston property that the Defendant had been taken into custody. The search warrants were signed around 8:30 p.m., approximately ten to twenty minutes after the Defendant was detained. Once the undersigned issued the search warrants, Agent Dobbs called his supervising agent at the Houston property to let him know that he had the search warrants. Accordingly, the Court finds that the Summers doctrine does not justify the Defendant's initial stop and detention.

Instead, the Court finds that the officers properly conducted a Terry stop of the Defendant. "[A] brief investigative stop, or Terry stop, by an officer who is able to point to 'specific and articulable facts' justifying his or her reasonable suspicion that the suspect has been or is about to be involved in criminal activity is not an unreasonable seizure." United States v. Martin, 289 F.3d 392, 396 (6th Cir. 2002) (quoting Terry v. Ohio, 392 U.S. 1, 21 (1968)) (other citations omitted).

56

A court reviewing the legality of an investigative stop must consider the totality of the circumstances in evaluating the presence of reasonable suspicion. United States v. Arvizu, 534 U.S. 266, 273 (2002); Martin, 289 F.3d at 398. Assessing whether an investigatory stop comported with the Fourth Amendment is a two step process: First, the Court must determine whether the officer had a reasonable basis for the stop by looking to whether the officer had reasonable suspicion supported by specific and articulable facts. United States v. Caruthers, 458 F.3d 459, 464 (6th Cir. 2006). Second, if the stop was proper at its inception, the Court must examine whether the intrusiveness of the stop was reasonably related to the situation by reviewing the reasonableness of the officer's actions in the context of the presenting circumstances. Id.

In the instant case, the officers properly stopped the Defendant because they had reasonable suspicion that a crime was about to occur if immediate action was not taken. At the time the officers entered Rocky Houston's property, they knew of the Defendant's hostile attitude toward law enforcement.[16] They observed the Defendant get on an ATV at his trailer and drive toward them at a high rate of speed. They could see that the Defendant was armed. These circumstances gave the officers specific and articulable facts to suspect that a crime was about to occur and that they were in immediate danger.

Second, the Court finds that the intrusiveness of the stop, which involved removing the

---

[16]Agent Dobbs' affidavit in support of the search warrant for the Defendant's residence relates that the Houston brothers' "anti-law enforcement attitudes" were known to local law enforcement along with the fact that they were charged with murder in 2006 for shooting a Roane County deputy and his civilian ride-along. [Doc. 19, Exh. 2, p.8-9, ¶4] Additionally, Agent Dobbs testified that the Defendant had hand-painted signs, which had been posted for years, prominently displayed on his property. The signs alleged corruption and crimes by public officials, and one contained photographs of the deceased bodies the aforementioned officer and his ride-along companion.

57

Defendant from his ATV, handcuffing him, and moving him to his brother's carport, was reasonable in light of the circumstances that the officers faced an attack by the Defendant while preparing to execute a search warrant at his brother's house. When the circumstances of an investigatory detention reveal that the officer's safety is at risk, the Sixth Circuit has permitted greater intrusion into the detanee's personal freedom as a part of an investigatory detention. See United States v. Hardnett, 804 F.2d 353, 357 (6th Cir. 1986) (holding that officers were justified in blocking the defendant's car, approaching with guns drawn, and ordering the occupants out of the car as a part of the Terry stop based upon tip that the occupants were armed). Specifically, handcuffing a suspect does not "exceed the bounds of a Terry stop, so long as the circumstances warrant that precaution." Houston v. Clark County Sheriff Deputy John Does 1-5, 174 F.3d 809, 815 (6th Cir. 1999) (upholding handcuffing of suspects believed involved in a shooting). The Court finds that stopping the Defendant at gunpoint, handcuffing him, and removing him to Rocky Houston's carport was reasonable in light of the danger to the officers presented by an armed family member speeding toward officers while they prepared to secure property.

Finally, the Court examines the propriety of the length of the detention. Ordinarily, an officer's reasonable suspicion permits the officer to detain the suspect while asking a moderate number of questions to identify the suspect and either confirm or dispel the officer's suspicions. Martin, 289 F.3d at 396. During the first ten to fifteen minutes that they questioned the Defendant, the officers received word that Agent Dobbs had search warrants for the Defendant's and Rocky Houston's residences. The officers could then properly continue to detain the Defendant incident to the execution of the search warrants. At that time, he was an occupant of Rocky Houston's carport and was within the line of sight of his own trailer. Moreover, his earlier conduct of racing

58

toward the officers while armed cause the officers reasonably to fear for their safety if the Defendant were not detained during the execution of the search warrants. The Court finds that the officers' actions in detaining the Defendant were objectively reasonable under the <u>Summers</u> doctrine.

After he was handcuffed, an officer advised the Defendant of the <u>Miranda</u> warnings, and the he agreed to talk to the officer. The Defendant was detained around 8:15 p.m. and was moved to his brother's carport, where he began talking with an agent. The search warrants were signed at 8:30 p.m., and Agent Dobbs immediately called his supervisor to alert the agents at the Houston property that the search warrants had been issued. The Defendant was still being interviewed when Agent Dobbs arrived at the property around 9:15 p.m. At some point during the interview, the Defendant made the statements that he had been "getting high and getting drunk" and made a reference to "wacky tobacco."

The Court finds that the Defendant was properly advised of the <u>Miranda</u> warnings because he was in police custody. Law enforcement officers must advise a person of the <u>Miranda</u> warnings when the person is questioned while in police custody. <u>Miranda v. Arizona</u>, 384 U.S. 436,478-79 (1966); <u>see also</u> <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977) (per curiam) (holding that the obligation to administer <u>Miranda</u> warnings only arises if there has been "such a restriction on a person's freedom as to render him 'in custody'"). To determine whether an individual is in custody for purposes of receiving the <u>Miranda</u> warnings, the Court examines the totality of the circumstances to assess how a reasonable person in that situation would have interpreted the situation. <u>Stansbury v. California</u>, 511 U.S. 318, 323 (1994) (holding that the court looks to "the objective circumstances of the interrogation, not on the subjective views" of the questioning officers or the defendant); <u>United States v. Salvo</u>, 133 F.3d 943, 948 (6th Cir. 1998). In other words, would a reasonable

59

individual in the same position as the defendant have felt free to leave.  United States v. Swanson, 341 F.3d 524, 529 (6th Cir. 2003).  In the present case, the Court finds that at the time he was interviewed , the Defendant was handcuffed and detained in his brother's carport.  The Defendant was not free to leave and was, thus, in police custody.

The Court finds that the Defendant was properly the subject of an investigatory stop and was detained for officer safety and incident to the execution of search warrants at his and his brother's property.  He was properly advised of his rights pursuant to Miranda, and he waived those rights and agreed to talk with the agent.  Accordingly, the Court finds no basis to suppress the Defendant's statements made subsequent to his detention.[17]  Law enforcement had probable cause to arrest the Defendant that evening for being an unlawful user of a controlled substance in possession of firearms based upon their observation that he was armed when he drove toward him, his statement that he had been getting high, and the marijuana residue, drug paraphernalia, and odor of marijuana discovered in his trailer during the execution of the search warrant.  Accordingly, the Court finds that the Defendant's detention and seizure comported with the Fourth Amendment.  The Court recommends that his motions to suppress his statement be denied.

---

[17]The Defendant does not argue that his statements were involuntary, only that they were the fruit of his illegal seizure.  Nevertheless, the Court has no evidence that his statements were the product of police coercion.  See Colorado v. Connelly, 479 U.S. 157, 167 (1986) (observing that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment"); McCall v. Dutton, 863 F.2d 454, 459 (6th Cir. 1988) (holding that "[i]f the police misconduct at issue was not the 'crucial motivating factor' behind petitioner's decision to confess, the confession may not be suppressed").  Although multiple officers drew their guns on the Defendant when he was initially stopped, the evidence before the Court is that he was questioned by one or two agents in his brother's carport.  There is no evidence that the interviewing agents had their weapons drawn or abused the Defendant in any way.  Accordingly, based upon the evidence presented by the parties, the Court finds that the Defendant's statements were voluntarily given.

60

# V.  CONCLUSION

After carefully considering the evidence, the parties' filings and arguments, and the relevant legal authorities, the Court finds that the warrantless use of a pole camera to continuously observe unobstructed curtilage on the Defendant's property for a period of ten weeks violates the Fourth Amendment.  However, the Court finds that the agents who installed and monitored the pole camera without a search warrant acted in good faith and, thus, the exclusionary rule should not be applied in this case.  Additionally, the Court finds that the subsequent search warrants issued on December 19, 2012, and January 11, 2013, were valid.  Finally, the Court finds that the Defendant was legally seized and detained and that his subsequent statements are not subject to suppression.  Accordingly, the Court **RECOMMENDS** that the Defendant's motions [**Docs. 14, 16, 18, 20, 47, 57, and 58**] should be **DENIED**.[18]  The Clerk of Court is directed to mail a copy of this report to the Defendant at the Blount County Jail.

Respectfully submitted,

s/ C. Clifford Shirley, Jr.
United States Magistrate Judge

---

[18]Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended).  Failure to file objections within the time specified waives the right to review by the District Court.  Fed. R. Crim. P. 59(b)(2); see  United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order).  The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general.  Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).